Claude Lee **WILKERSON, Appellant,**

v.

The **STATE of Texas, Appellee.**

**No. 68937.**

Court of Criminal Appeals of Texas,
En Banc.

May 18, 1983.

Rehearing Denied July 20 and
Sept. 14, 1983.

Stanley G. Schneider and Jules Laird, Houston, for appellant.

John G. Holmes, Jr., Dist. Atty., Winston E. Cochran, Jr., Don Stricklin and Dick Bax, Asst. Dist. Attys., Robert Huttash, State's Atty., Houston, and Alfred Walker, Asst. State's Atty., Austin, for the State.

## OPINION

CLINTON, Judge.

This is an appeal from a conviction for capital murder in which the punishment was assessed at death.

Because of our disposition of appellant's seventh ground of error, a detailed recitation of the facts constituting the offense is obviated.[1] That ground of error contends the trial court erred in admitting appellant's inculpatory statement "which was involuntarily obtained in violation of the Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States and Article I, Sections 10 and 19 of the Constitution of the State of Texas."

Prior to trial, appellant filed a motion to suppress his written statement on grounds conforming to the above allegation. The trial court conducted a hearing on the motion, at the conclusion of which he dictated his findings of fact, conclusions of law[2] and his decision to overrule the motion to suppress. Appellant again raised the issue during trial on the merits and requested its submission to the jury, which request was

---

1. Appellant does not contest the sufficiency of the evidence to support the jury's verdict of "guilty."

2. Paraphrased, the salient findings of fact are: (1) appellant was given repeated warnings by law enforcement officers, a magistrate and an assistant district attorney prior to his state-ment; (2) no force, threats, promises or other undue influence was applied; (3) appellant "had access or actually conversed with or was counseled by" the retained attorney of his choice "at all times;" and (4) the statement "was freely and voluntarily made and therefore admissible for consideration by the finders of fact."

denied.[3] The issue was also urged on motion for new trial.

The material facts are not in dispute. Appellant was arrested without a warrant on Tuesday, January 24, 1978, apparently because he had been observed driving the car of one of three persons who had been reported missing the preceding day and who appeared to have been victims of a robbery. At approximately 3:00 p.m., the Honorable Fred Dailey received a call from Pat Fantich, the wife of one of the missing persons, who advised him appellant wanted to talk to him about legal representation. Dailey proceeded to the Robbery Division of the Police Administration Building where he spoke with and was retained by appellant.

At approximately 8:00 p.m., appellant was escorted by Detective Joe Williams to the courtroom of Municipal Judge Rosemary Saucillo, where he was warned of his rights;[4] appellant acknowledged his understanding. He was given a copy of the written warning which also had a line struck through the portion dealing with bail. Appellant's attorney was waiting for him on his return to Robbery Division.

The next morning, Wednesday, January 25, at 8:00 a.m., attorney Dailey met appellant at the city jail, then later that morning, they met in the grand jury anteroom of the Harris County Court Annex, along with Assistant District Attorney Mike Hinton and a Detective Beale. Appellant, according to Hinton, was afraid and apprehensive; he did not want to testify and "if he knew

anything, he did not care to divulge it."[5] Appellant ultimately decided to testify. Hinton warned him of his rights and on two occasions appellant interrupted his testimony to consult with Dailey outside the grand jury room before answering questions. After testifying for two hours before the grand jury, appellant was "released."

The next day, Thursday, January 26, Hinton left a telephone message for appellant to call him. When appellant returned the call in the early afternoon, Hinton apparently told him he wanted to meet so they could talk. According to Hinton, appellant "indicated he wanted to talk further [but] he said he did not have any transportation." Appellant also complained to Hinton of severe pain he was having due to an arm injury which had become infected. Hinton arranged to have appellant admitted to the private Rosewood Medical Center, telling the owner-physician he "wanted to take precautions to protect him." Hinton's recollection was that appellant was admitted under an assumed name.[6] Appellant called his attorney, Mr. Dailey, from the hospital and the two spoke by telephone about five more times that day. In the interim, Hinton arranged to meet Dailey, Assistant District Attorney Don Stricklin and a Lieutenant Fulbright at the hospital late in the evening.

According to Dailey, he arrived at the hospital at approximately 9:00 p.m. and had consulted with appellant for approximately 30 minutes when Stricklin, Detective Jerry Carpenter (who was assigned to the D.A.'s

3. The trial court's ruling on his objection and requested addition to the charge in this respect, forms the basis of appellant's sixth ground of error.

4. As a part of the warning, appellant was told: "You have been accused of the offense of robbery and kidnapping." [All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.]
Detective Williams conceded there was insufficient evidence to charge appellant with these offenses, only enough to "accuse" him.

5. Hinton testified that he talked with Dailey and appellant for a couple of hours trying to persuade appellant to give the grand jury the

benefit of what he knew about the disappearances. He told appellant he was not the focus of the investigation and not to "be in fear of prosecution" for any past drug dealings or the like, though "there is no immunity from the offense of perjury."

6. Quizzed on crossexamination about why appellant was not admitted to the County Hospital, Ben Taub, Hinton insisted he did not know what kind of situation he was dealing with because appellant continued to indicate that one reason for not talking was his fear for his own safety. Hinton felt appellant would be more secure in the private hospital. However, the record reflects appellant was admitted under his own name.

Special Crimes Division) and a Robbery Division Lieutenant—apparently Fulbright—entered appellant's room. Stricklin started a conversation with appellant "about cars" and "asked [him] how he moved around." According to Dailey's testimony elicited on direct examination by Prosecutor Stricklin,

"And he gave you an answer that you weren't satisfied with. Because you felt it was kind of vague. And then, you got rather specific about whether he used Dan Fantich's Mercedes. And he denied that, rather vehemently. And you and he began to have rapid and heated discussions about—around the car. And he did not want to answer you at all. And finally you got up and said 'I will wait until Mike [Hinton] gets here.' And I said, 'That's probably a good idea.'"

Everyone but Dailey left appellant's room.

Mike Hinton, who all witnesses agreed had developed a degree of rapport with appellant, arrived at the hospital at approximately 10:00 p.m. Hinton and Carpenter entered appellant's room, and in the presence of Dailey, Hinton began pleasant conversation. But eventually, according to Dailey,[7] "Hinton broke the news to Mr. Wilkerson, ... that he felt he knew and could prove that Wilkerson had lied four times before the Grand Jury [the day before] and that he ... could file on them. But, that he, Hinton, would give Wilkerson a chance to make up for it. That he would not file the charges if Wilkerson would come clean and tell him what he knew about Fantich's disappearance." This conversation lasted approximately 30 minutes and at its conclusion, Dailey asked if he could speak with his client alone for a moment.

According to Hinton, appellant was "genuinely trying to make a decision of whether to talk with the authorities." When Hinton reentered the room, another lengthy conversation occurred after which Dailey asked everyone to leave again; he consulted privately with appellant. According to Dailey, he stopped the "questioning or interrogation" two or three times "before they pushed any further." The third time Hinton and Detective Carpenter entered, the conversation lasted for about two hours, and, according to Dailey,

"It seemed to lead nowhere and contained no real substance. But, at some point Claude Wilkerson finally got around to telling Mike Hinton that *he wished to say no more and cooperate no further* with the District Attorney's Office or the Police Department in the investigation concerning the disappearance of the three people."[8]

The interview was at that point terminated; Hinton told appellant "I hope you know what you are doing," and advised him he was under arrest for perjury[9] and would be left in the custody of the officers. The prosecutors left.[10] Detective Carpenter pulled his chair up to appellant's bed and began some "small talk."

Dailey testified that at this point,

"I told Jerry Carpenter that I didn't want any more interrogation. And I didn't want any more conversations. That Wilkerson had told me that he didn't want to say anything. * * * So, the whole time I felt like [appellant] and I [had been] in control of the situation. And we could stop it at any time and we did, two times. [When I left the hospital] I felt like [the District Attorney's Office and Houston Police Department] understood [there was to be no more questioning of my client]."

Dailey stated he left the hospital feeling "as satisfied as I could be as a defense lawyer"

---

7. Though the testimony of Dailey, Hinton and Carpenter as to the sequence of the conversations between Hinton and appellant that night, conflicts in minor detail, the substance of those conversations is undisputed.

8. Hinton also testified appellant stated he did not want to talk anymore.

9. No charges had been, or ever would be, filed against appellant for perjury.

10. Hinton's testimony was "then Mr. Dailey and I parted ways from the hospital, thinking that Claude was just going to—just not talk to anybody."

that his instructions "would be honored and adhered to."

Carpenter testified that he had read appellant his rights when he was placed under arrest, and had called for a uniformed officer to take custody of appellant. Carpenter was asked:

"Q: Did Mr. Dailey tell you anything in his client's presence as to whether or not his client was willing to make a statement or to talk?

A: *Yes. I believe it was in Mr. Wilkerson's presence* at—near the end of this period of time before he was arrested. *Mr. Dailey made it known that he didn't want us to talk to him or question him any more about this case.*

Q: State whether or not you questioned the defendant about the case or talked with him after Mr. Dailey left?

A: I did. I made a statement to him.

Q: What was that statement?

A: *I told him that I understood that Mr. Dailey didn't want us to talk to him or question him in regard to this case.* But, I told him I wanted him to know that if he wanted to talk to me about the case and tell me the truth, that it was his decision and nobody else's.

Q: Did you say anything else?

A: Not after his response.

\* \* \* \* \* \*

Q: What was his response?

A: *He indicated he did not want to talk about it.*"

When a uniformed officer arrived, Carpenter instructed him that though appellant was under arrest, he was a patient in the hospital, so when he was released from the hospital, he was to be taken to city jail. It was approximately 2:00 a.m. on Friday,

January 27, when Carpenter left these instructions.

The record of the motion to suppress hearing is silent as to the whereabouts of appellant for the subsequent 12 hours.

However, the record reflects that on Friday morning, Fred Dailey received a message that a hearing had been scheduled at 9:00 a.m. that day for the purpose of setting a "material witness" bond for appellant. Dailey called to say he would be late and was told it did not matter because the hearing had been rescheduled for 11:00 a.m. Later in the morning, Dailey contacted the court by phone again, and was told, "No, it will be held at 1:30." So, at 1:30 p.m., Dailey went to the courtroom, but found no one connected with the case was present. The judge of the court told Dailey that the D.A.'s Special Crimes Bureau had just called and, "they are waiting for you over there."

On his arrival, Dailey testified, "I probably asked the receptionist where the people involved with Claude Wilkerson and the officers and all, where they were.[11] \* \* \* I probably asked if I could see him. And they announced that he had not asked for me." On cross-examination, Dailey explained his failure to "demand" to see his client thus:

"I have had the same kind of run-ins, I am sure you have had with the police. I have been told that it's not an absolute right to see a client, that if a client wants to see me that he would be allowed to see, [sic] governed by certain rules concerning jails and police administration. And so, I asked to see him and the [sic] said, 'He has not asked to see you,' that's where it stopped."

However, Dailey testified:

"I asked various people several times during the afternoon if they had seen him. And if he had asked to see me. \* \* \* I

---

**11.** Catherine McMaster, a secretary for the Special Crimes Division, testified in this vein as follows:

"Q: Did Mr. Dailey ever ask you to make arrangements to see his client?

A: Yes, sir, he did.
Q: And did you do that?
A: No, sir, I did not. I did not know who his client was."

was told 'No.' That he had not asked to see me."

Meanwhile, Detective Earl Musick arrived at the Robbery Division of the Houston Police Department, at approximately 2:00 p.m. and encountered appellant in the custody of a Detective Burkham. Musick "enter[ed] into a conversation" with appellant who "told [him] that he wanted to tell the truth about this incident. That he wanted to talk with Pat Fantich before he would tell the truth." Musick began effectuating the request.

Mike Hinton testified that at 3:00 p.m., he "received word"—he could not remember from whom or by what means—that appellant "wanted to talk to [him] again." According to Hinton, he had already made arrangements for appellant's attorney to be at the Special Crimes Bureau.[12] Evidently Hinton had appellant brought to the D.A.'s office.[13] Hinton spoke with appellant for only five minutes. Appellant expressed his fear for the safety of Pat Fantich and her children and apparently advised Hinton he had decided to talk on the condition he could first talk personally with Pat Fantich. Appellant was allowed a thirty minute taped interview[14] with Mrs. Fantich at which time they were interrupted by Detective Musick who asked him what decision he had made. Appellant said he was "ready to tell the truth." Musick and Detective Beale took appellant to Stricklin's office, where appellant told the story of robbery, kidnapping and murder which forms the basis of his conviction. Musick had appellant tell the story again. Musick then read appellant his rights and the waivers. After Musick read, "You do not want to consult with a lawyer before making this statement and you do not want to remain silent," appellant said, "Hold it a minute. I want to talk to Mike Hinton." Appellant was allowed to speak to Hinton. Musick repeated the warnings; appellant said he understood. Musick then took appellant to Catherine McMaster's office in order to have his statement typed. The typing had begun when appellant asked to use the restroom; Musick escorted him down the hall.

At approximately 5:00 p.m. or later, as appellant's attorney, Fred Dailey, walked down a corridor of the Special Crimes Bureau, he confronted appellant, accompanied by Detective Earl Musick, who had approached the corner from an opposite direction, by a water fountain. Dailey's description of the exchange:

"I don't recall how I greeted him. There might have been some degree of shock

---

**12.** According to Hinton, he was the person who was communicating with appellant's attorney that day, and who "had the primary function of communicating with Claude Wilkerson's attorney until he waived his right to have an attorney."

**13.** Asked to explain the basis of appellant's custody, Hinton testified:

"There was a discussion between the defendant and his counsel about the possibility of an aggravated perjury indictment. *But, he had not been filed on.*

*So, at the time he was brought up to my office, instead of taking that avenue,* after consultation with Mr. Vance and my colleague, Mr. Stricklin, *it was decided not to file on him for any criminal offense.* And we had requested time from Judge Moore to present evidence and to justify and ask the Court to set a material witness bond.

And Mr. Wilkerson and my conversation with Mr. Wilkerson in the office of the Special Crimes was before we got to the material witness bond hearing. *And as it developed we never had the hearing. There was no formal charges filed on the defendant at that time* and had not been previously. But, rather than exercise a perjury avenue, we thought—*we still didn't know what happened and what was going on in the disappearance of the three.*

We decided to utilize the material witness bond. And *that was never formalized.* And my testimony will be that he was in custody as a material witness. At that point, we felt that he had enough information in that *I was very reluctant to turn him loose again,* but we *didn't know what the answer* was *as to the disappearance of the three.* We had some indication of his involvement."

It is clear from this testimony that there *was no* legal basis for appellant's custody and the State was in a bind: if a perjury indictment was filed the agreement with appellant not to charge him if he told the truth would be broken; if a bond were set, appellant would walk free without telling what he knew.

**14.** By the time of trial, the State had misplaced this tape. It was never found.

involved in meeting him that way. But, I know I asked if he was doing what he wanted to. And he replied, 'No, not really.' And I said, 'Then stop it.' And he said, 'No, I have to. I have to do it.' And I said, 'Well, then, what you are really saying is, you are doing what you want to do but you don't like it?' and he said, 'Yeah, I guess so.' * * * I said, 'Well, I've been here and I will be here if you want me. I'm here.' "

Dailey stated appellant neither asked to speak with him, nor told him to go away. Dailey also testified after seeing appellant at the water fountain, he was satisfied the latter did not want to see him.[15]

Musick and appellant returned to Catherine McMaster's office where his statement was reduced to writing and edited and signed.

Dailey saw appellant once more that night at approximately 8:00 p.m. Dailey had been given a copy of appellant's statement, and he inquired about appellant's giving it; appellant replied: "I had to do it and you may not understand it, but I had to do it."

### Fifth or Sixth Amendment Right?

◼ The Supreme Court of the United States has in recent years clarified a distinction between the *Sixth* Amendment right to the assistance of counsel—"that a person is entitled to the help of a lawyer *at or after the time judicial proceedings have been initiated against him* [ ] 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment' "[16]—and the *Fifth* Amendment right to have counsel *"present during custodial interrogation"*[17] identified by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), both of which were made applicable to the states through the Fourteenth Amendment.

Therefore, the threshold issue we confront is whether either or both of these federally secured rights had attached, or been invoked, at the time appellant imparted to agents of the State his involvement in the instant offense.

It appears clear that the nearest appellant came to having had "judicial proceedings initiated against him," or having been "formally charged" with an offense, was when he was arrested on the "accusation" of "kidnapping and robbery" on January 24, then held until he testified before the grand jury the next day. It is undisputed that appellant was assisted by counsel at all times during that period.

From the time he was released on January 25 until he implicated himself in the offense on January 27, appellant was not charged with anything, see n. 13, *ante,* and was in fact, being illegally held by the

**15.** Detective Musick recalled the encounter as follows:

"Fred asked Claude if he was sure that he did not want to talk to him and Claude said, 'Yes.'

Fred asked Claude if he knew what he was doing. Claude said, yes, he did. He asked Claude, 'Are you doing what you want to do?' Claude then said, 'I do not guess anyone would want to give a confession, but you know, I have to.'

And Fred said, 'Now, wait a minute. You have to?' And he said by this, 'Are you saying that they are threatening you? Are they making you do something you don't want to do?' Claude said, 'No. They have nothing to do with it. It's my own personal reasons. You know, I have to tell the truth.'

And Fred said, 'Well, you know you know what I have advised you and are you aware of all this?' And he said, 'Yes.'

The rest of the conversation related to Fred, told him that he was in Special Crimes, had been in Special Crimes and would be available if he changed his mind and wanted to talk to him at any point that he was going to go ahead and remain there at Special Crimes."

**16.** *Brewer v. Williams,* 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977), quoting *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972).

**17.** *Edwards v. Arizona,* 451 U.S. 477, 482, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378 (1981). See also *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); and *Stone v. State,* 612 S.W.2d 542 (Tex.Cr.App.1981).

State.[18] Moreover, the record discloses with clarity that the authorities had no real sense of appellant's involvement in the offense, and in fact believed it possible that, though he had knowledge of it, he was not actually involved at all. Cf. *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); and *Massiah v. U.S.,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

■ It therefore appears that no judicial proceedings had been initiated against appellant by formal charge or in any other traditional form. However, the State concedes and, indeed, it is uncontradicted in the testimony, that appellant was taken into the State's custody (albeit unlawfully) when he refused to talk to the prosecutors in the wee hours of January 27, at the hospital; he was at that time warned of his *Miranda* rights by Detective Carpenter; his desire not to talk further with the authorities had been repeatedly expressed; he was represented by retained counsel at that point and had been accompanied by counsel during all discussions with agents of the State up to that point; and, finally, before departing the hospital between 1:30 and 2:00 a.m., appellant's counsel had clearly indicated his client was not to be questioned in his absence.

Thus, we need not decide whether appellant's representation by counsel at a time when adversary proceedings had not yet commenced, *alone* activated his Sixth and Fourteenth Amendment right to the assistance of counsel,[19] because it is abundantly clear that his Fifth and Fourteenth Amendment right to have counsel present during any custodial interrogation had been asserted at the time relevant to our inquiry. *Stone v. State,* 612 S.W.2d 542 (Tex.Cr.App. 1981).

### Waiver

■ It is likewise plain that appellant's counsel was not present at the time he gave his statement; neither was appellant's counsel with him during the 15 hours which preceded the written statement.[20] Accordingly, the next question before us is whether appellant waived his formerly invoked right to the presence of his attorney during custodial interrogation.

■ Concerning circumstances such as those before us, the Court in *Miranda,* supra, 384 U.S. at 475, 86 S.Ct. at 1628 stated:

"If the interrogation continues without the presence of an attorney and a statement is taken, *a heavy burden rests on the government to demonstrate* that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel."

See also *North Carolina v. Butler,* 441 U.S. 369, 372–373, 99 S.Ct. 1755, 1756–1757, 60 L.Ed.2d 286 (1979); and *Faulder v. State,* 611 S.W.2d 630, 641 (Tex.Cr.App.1980) (Opinion on State's Motion for Rehearing). Thus, the question of waiver turns on whether the State has met its "heavy burden" of establishing a "knowing and intelli-

18. Indeed, had appellant sought suppression of his confession on *Fourth* Amendment grounds, alleging it was a product of this illegal detention, see *Green v. State,* 615 S.W.2d 700 (Tex. Cr.App.1981), our task would be simplified, but, though raised in the trial court and neglected by the trial judge in his findings, the Fourth Amendment claim has not been pursued on appeal.

19. "In both *Massiah* and *Williams* the challenged statements were obtained at a time when judicial proceedings had been initiated against the accused *and* he had already obtained counsel. It is fairly clear, however, that the commencement of adversary proceedings *alone* activates the right to counsel.

* * * Whether representation *without more* triggers the right to counsel is a good deal less clear. . . . The Supreme Court is likely to so hold, at least when law enforcement officers treat the defense lawyer deceitfully or disdainfully." [Emphasis original] [citations omitted] YALE KAMISAR, *Brewer v. Williams, Massiah and Miranda: What Is Interrogation? When Does It Matter?,* in PO-LICE INTERROGATION AND CONFESSIONS 142, n. 6 (1980).

20. The trial court's finding that appellant "had access or actually conversed with or was counseled by" the retained attorney of his choice "*at all times*," finds no support in the record before us.

gent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding the case, including the background, experience and conduct of the accused.' *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) [other citations omitted]." *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Wyrick v. Fields,* —— U.S. ——, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982).

■■■ The State's brief contends that since appellant was given repeated warnings and there is no evidence of coercion, his confession was voluntary. Similarly, the trial court found no threats or coercion were applied and the confession was voluntarily obtained. But the question of "voluntariness" is an inquiry discrete from whether a knowing and intelligent waiver occurred; accordingly, however voluntary the statement may have been, the issue of waiver is not thereby resolved. *Edwards,* supra. The State also contends that appellant's "refusal to summon" his attorney "despite [the] advice that [he] keep silent and call Dailey in before making any further statements" strongly indicates appellant did not want counsel present *while giving the confession.* Even if these factual assertions were supported by the record,[21] they are irrelevant. For our understanding of the right involved here, is that the Fifth Amendment guarantees the presence of counsel during *interrogation,* which by definition is designed to elicit,[22] and therefore necessarily precedes, an incriminating response. Moreover, on the question of waiver,

> "*Miranda* teaches that no weight is to be given a failure on the part of the accused to specifically request an attorney's assistance or that interrogation cease in the exact language of that case, or, for that matter, at all; likewise, the mere fact 'that appellant answered the officers'

questions raises no presumption of waiver.' "

611 S.W.2d at 641. And the Court in *Edwards* concluded that analysis by observing that Edwards' "statement, made without having had access to counsel, did not amount to a valid waiver . . . ."

What then must the State prove in this context in order to establish waiver?

> " . . . [A]lthough we have held that after initially being advised of his *Miranda* rights, the accused may himself validly waive his rights to respond to interrogation, see *North Carolina v. Butler,* supra [441 U.S.] at 372–376 [99 S.Ct. at 1756–1759], the Court has strongly indicated that *additional safeguards are necessary when the accused asks for counsel;* and we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that *an accused,* such as Edwards, *having expressed his desire to deal with the police only through counsel, is not subject to further interrogation* by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges or conversations with the police.*"

*Edwards,* supra, 451 U.S. at 484–485, 101 S.Ct. at 1884–1885.

In oral argument before this Court, the State by inference conceded that appellant's right to counsel's presence during custodial interrogation had been invoked but abridged, by characterizing his coincidental meeting with his attorney by the water fountain as a "happy accident" which broke "in favor of the State." Arguing that this conversation illustrated appellant's knowing

---

**21.** We note that there is neither evidence appellant "refused" to summon his attorney, nor evidence his attorney instructed appellant to "call Dailey in" should the police start to interrogate him again. Clearly, Dailey relied on the State's understanding that questioning was not to commence again in his absence.

**22.** *Rhode Island v. Innis,* supra; *McCrory v. State,* 643 S.W.2d 725 (Tex.Cr.App.1982).

relinquishment of counsel's presence, the State would have us find a constitutionally adequate waiver.

■ Yet, the record developed upon appellant's motion to suppress is virtually silent as to the whereabouts of appellant during the preceding 15 hours; indeed, evidence of which party—the accused or the State—initiated "further communication, exchanges or conversations," is notably absent.[23] The fact that agents of the State caused appellant's attorney to believe he should be at the courthouse off and on throughout the morning and early afternoon might support an inference that the State deliberately engineered appellant's separation from him during this time. Thus, under the totality of the circumstances established,[24] the State has fallen short of its burden of proof, and we so hold.

This case illustrates why the burden is appropriately placed on the State to affirmatively prove the accused initiated further contact with agents of the State: the reason the State did not prove appellant initiated contact with the police is that the State *could not* prove it. Testimony finally adduced by the State at trial[25] revealed that on the morning of Friday, January 27, Houston Police Captain L.N. Zoch dispatched Detectives Burkham and Beale at 11:00 a.m. to the Rosewood Hospital to pick up appellant and bring him back to the Robbery Division—*not* the city jail. Appellant was brought in at around noon and taken into Zoch's office. Over the next hour, Detectives Burkham, Beale, Musick,

Carpenter and Williams talked to appellant in varying combinations.[26]

At 1:00 p.m., Captain Zoch, accompanied by a Detective Kent took over the interrogation. According to Zoch, after two to three hours of "discussion," appellant made a request: "he would like to discuss this further after he would be—if he were permitted to call Mrs. Fantich and discuss matters with her." Asked on crossexamination how appellant's "request" came about, Zoch replied:

"We had a long discussion. I don't know, sir, if you want me to go into the topic prior to this request or not.

Q: Well, let's just put it this way: You were attempting to convince him to make a voluntary statement? Would that be a fair question?

A: We were—I wanted some information very badly, yes, sir."

■ There is no question appellant was subjected to further interrogation in the absence of his lawyer. The State has failed to meet its heavy burden of establishing he knowingly and intelligently waived his right to counsel's presence during interrogation, because there is no evidence that the interrogation was initiated by him subsequent to his assertion of that right.[27] Accordingly, the trial court reversibly erred by admitting appellant's statement obtained under these circumstances for the jury's consideration at his trial, and we are constrained to so hold.

---

**23.** The only evidence in this regard breaks against the State. See *ante* at 787–788 wherein Detective Carpenter talked to appellant after Dailey left the hospital, and told him he understood his lawyer's wishes, but that if appellant wanted to talk, it was his and no one else's decision. Appellant told Carpenter again that he did not want to talk about it.

**24.** The question of waiver must be determined from the totality of the circumstances. *Wyrick,* supra; *Edwards,* supra.

**25.** We do not resolve the issue on this testimony given at trial. We merely note it in order to illuminate the fact that the State's failure to meet its burden of proof was not an oversight.

**26.** It is interesting to note that, other than Burkham and Beale, all of these detectives were called by the State to testify at the hearing on the motion to suppress. However, they were never asked to testify about their activities on January 27 before 2:00 p.m. Burkham and Beale, it will be recalled, picked appellant up from the hospital on the order of Captain Zoch.

**27.** Even under the more open approach to the waiver question expressed by Justice Powell, concurring only in the judgment of the Court in *Edwards,* the State has failed to meet its burden of proof in the instant case, *viz:* "a free and knowing waiver of counsel *before interrogation commenced.*"

The judgment of conviction is reversed and remanded.

McCORMICK, Judge, dissenting.

I agree with the majority that appellant did invoke his *Miranda* right to have counsel present at interrogation. *Stone v. State,* 612 S.W.2d 542 (Tex.Cr.App.1981). And I agree that the questioning of appellant by Burkham, Beale, Williams and Zoch in Zoch's office was improper. However, I strongly believe that any taint caused by that improper questioning was removed when appellant consulted with his attorney *before* he gave his confession.

The record shows that during the "discussion" in Zoch's office appellant agreed to give the police information if he would first be permitted to talk with Pat Fantich, the wife of one of the victims. Appellant and several police officers then proceeded to Mrs. Fantich's home, picked her up and proceeded to the Special Crimes Bureau.

Assistant District Attorney Mike Hinton testified that he received information that afternoon that appellant wanted to talk with him. After receiving this information, he made arrangements for appellant's attorney, Fred Dailey, to come to his office. Hinton testified that Dailey was present in the Special Crimes Bureau before he began talking with appellant. He also testified that appellant was aware his attorney was present, but appellant never asked to see his attorney. Hinton testified that he talked with appellant for five or ten minutes. Appellant then talked with Mrs. Fantich for approximately thirty minutes. While they were talking, Hinton went in and talked with appellant's attorney, Fred Dailey.

"Q. At the time that you talked with Fred Dailey, did he ask you where his client was?

"A. He knew where he was. He was around the hall in your office.

"Q. And approximately how far was that away from where Mr. Dailey was sitting?

"A. Thirty-five feet, I guess."

After appellant concluded his talk with Mrs. Fantich, he again talked with Hinton.

"A. ... Our talk, between J.C. (appellant) and myself was not about the elements of the crime. It was about personal feelings that he had and fears and thoughts and decisions that he was having to make at that time."

Hinton testified he then left the room and proceeded to his own office where he talked with Dailey and Judge I.D. McMaster, who was there waiting to pick up his wife.

Earl Musick, a detective with the Houston Police Department, testified that he brought Mrs. Fantich and appellant to the Special Crimes Bureau on that Friday. After appellant and Mrs. Fantich talked and appellant had talked with Hinton, appellant began telling his story. As appellant began dictating his confession, he asked to go to the restroom.

"Q. During this process of going to the restroom, did you encounter any person who was not involved in law enforcement or attached to the District Attorney's Office?

"A. Yes, sir, Fred Dailey.

"Q. Did Fred Dailey have a conversation with Claude Wilkerson in your presence?

"A. Yes, sir, he did.

" * * *

"Q. Can you tell us what you overheard there of that conversation?

"A. Fred Dailey asked Claude if— He said, 'Claude, don't you want to talk to me?' Claude replied, 'No.'

" * * *

"A. Fred asked Claude if he was sure that he did not want to talk to him and Claude said, 'Yes.'
Fred asked Claude if he knew what he was doing. Claude said, yes, he did. He asked Claude, 'Are you doing what you want to do?' Claude then said, 'I do not guess anyone would want to give a confession, but you know, I have to.'
And Fred said, 'Now, wait a minute. You have to?' And he said by this,

'Are you saying that they are threatening you? Are they making you do something you don't want to do?' Claude said 'No. They have nothing to do with it. It's my own personal reasons. You know I have to tell the truth.'

And Fred said, 'Well, you know what I have advised you and are you aware of all this?' And he said, 'Yes.'

The rest of the conversation related to Fred, told him that he was in Special Crimes, had been in Special Crimes and would be available if he changed his mind and wanted to talk to him at any point that he was going to go ahead and remain there at Special Crimes."

Musick went on to state that appellant then gave a written confession.

Fred Dailey, appellant's attorney, testified that on Friday, January 27, 1978, when he appeared for a hearing concerning appellant, he was instructed to go to the Special Crimes Bureau. He arrived there at approximately 1:30 p.m. Dailey testified that when he arrived he was told appellant was there. When Dailey asked if appellant had asked for him, he was told "no." Sometime during the afternoon, Dailey ran into appellant at the water fountain.

"Q. At this point, did you have a conversation with your client?

"A. Yes.

"Q. What did you ask your client?

"A. ... But, I know I asked if he was doing what he wanted to do. And he replied, 'No, not really.' And I said, 'Then, stop it.' And he said, 'No, I have to. I have to do it.' And I said, 'Well, then, what you are really saying is, you are doing what you want to do but you don't like it?' and he said, 'Yeah, I guess so.'

"Q. At that time, did he ask to speak with you?

"A. No.

"Q. And you were having a face-to-face conversation with him?

"A. Yes.

"Q. Was that all of the conversation that you recall?

"A. I said, 'Well, I've been here and I will be here if you want me. I'm here.'"

Dailey further testified:

"Q. During this entire period of time, you had access to Claude Wilkerson or he had access to you?

"A. Yes.

" * * *

"Q. Were you satisfied after you had the conversation with Claude at the water fountain in the Special Crimes Division on Friday, that he did not want to see you?

"A. Yes."

In *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Supreme Court of the United States held that, when an accused has expressed a desire to deal with police only through counsel, the accused is not subject to further interrogation until counsel has been made available to him, or unless the accused himself initiates further communication, exchanges or conversation with the police. As Chief Justice Warren wrote in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966):

"Our aim is to assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process." 86 S.Ct. at 1625.

Where, as in the instant case, the appellant talked with his attorney before he gave his confession, and still insisted on making a confession, I feel that the goals of *Miranda* were met. Appellant made a knowing and counseled confession. Appellant's own attorney was convinced that appellant was aware of what he was doing and was cooperating with police knowingly and voluntarily. Under these circumstances, the taint was removed. Appellant's confession was not taken in violation of his Fifth Amendment right to counsel.

For the above reasons, I dissent.

W.C. DAVIS, MILLER and CAMPBELL, JJ., join in this dissent.