Jackie Wayne UPTON, Appellant,

v.

The STATE of Texas, Appellee.

No. 69717.

Court of Criminal Appeals of Texas, En Banc.

April 7, 1993.
Rehearing Denied May 26, 1993.

Jack O. Herrington, Clarksville, for appellant.

Tom Wells, Dist. Atty., Paris, Robert Huttash, State's Atty., Austin, for the State.

OPINION

McCORMICK, Presiding Judge.

A jury found appellant guilty of capital murder and answered the special issues under Article 37.071(b), V.A.C.C.P. affirmatively, whereupon the trial court assessed the mandatory penalty of death. Appellant raises eighteen points of error on direct appeal. We will reverse and remand.

Appellant contends in his first point of error the evidence is insufficient for any rational trier of fact to find beyond a reasonable doubt the murder was committed during the course of a robbery. V.T.C.A. Penal Code, Section 19.03(a)(1). The record reflects that Floyd Cummings, the victim, owned and operated a used car dealership in Paris. On June 19, 1985, Mr. Cummings' wife, Mildred Cummings, was in her husband's office on the used car lot. Mrs. Cummings remembered that some time during the day appellant stuck his head in the door and looked around the office. Appellant said nothing to her, and to her knowledge he said nothing to Mr. Cummings who was working just outside the office door. Mrs. Cummings was not personally acquainted with appellant, but knew his name. She had seen appellant on the car lot one other time. Later that

evening, Mr. Cummings [1] told his wife that his satchel, which contained the keys and titles to his cars that were for sale, was missing.

On the afternoon of June 19th, appellant's half-sister, Lois Melvin, with whom appellant lived, noticed a satchel hidden in the bushes near her apartment building. Melvin later discovered the satchel in her children's closet. Appellant shared a bedroom and closet with Melvin's two children. Melvin opened the satchel and found envelopes and other papers with Cummings' name on them. In addition, she found Cummings' checkbook and several sets of car keys. The next morning, June 20th, when Melvin confronted appellant about the satchel, appellant said he was holding its contents as collateral for a drug deal.

Before Cummings went to work on the morning of June 20th, he told his wife he had approximately $1,000 in his wallet. Cummings also was wearing his wedding ring and a Timex watch. That same morning another used car dealer, Hatcher, visited Cummings around 10:15 a.m. in order to deliver the title to a pickup Cummings had purchased a few days before. Hatcher saw a yellow Chevy Chevette on the lot, but a Mercury Cougar was gone. Around 11:15 a.m. Hatcher saw Cummings leave the lot in Cummings' Cadillac. That was the last time Hatcher saw Cummings. When Cummings failed to return home from work at his regular time, Mrs. Cummings became alarmed and drove to the lot. She noticed one of Cummings' cars, the Mercury Cougar, was missing from the lot. Mrs. Cummings never saw the victim again.

Also on the morning of June 20th, Melvin recalled that appellant left the apartment around 11:00 a.m. with the satchel and a knife, with the name "Old Hickory" stamped on its wooden handle, tucked in his boot. When Melvin asked appellant why he needed the knife, he responded it was necessary because "he might have trouble getting his money from a dude." Appellant returned to Melvin's apartment around 12:45 p.m. driving the Mercury Cou-

gar that would turn up missing from Cummings' car lot. Appellant explained to Melvin that he was going to purchase the car. Appellant drove off and returned later that afternoon in the Cougar. He removed the title to the Cougar from the satchel and showed it to Melvin. Melvin also recalled seeing appellant wearing a grayish blue long sleeve shirt that had two spots of blood on its sleeve. When asked about the blood, appellant said it was his own from a scratch he had received earlier in the day. Appellant sold the Cougar on June 22nd.

On the evening of June 20th, Melvin and Janet Lester saw appellant in a local bar in Paris. Melvin verified appellant still was driving the Cougar. Appellant explained he bought the car with profits from a drug deal. Melvin remembered appellant had about $60 to $70 when he was in the bar, but Lester recalled he had a larger amount of money. Appellant also bragged to Lester that he placed a $100 bet on a game of pool. He also was buying drinks for all his friends.

On June 21st, Delbert Smith saw appellant at Lake Gibbons driving the Cougar. Sometime later that evening, appellant commented to Smith and others the "laws" wanted to talk with him. Smith reported the "laws" talked with him the day before about the disappearance of a man who owned a car lot. Appellant asked his friends, "if you killed a guy and they couldn't find the body, could they prove anything." He also commented to Smith and his friends that "if he had to hide a body he would do it around a lake" because "there is plenty of places to hide one, tie weights around the body and throw it in and they would never find it."

The next day, June 22nd, while still at the lake, appellant told Smith he was going to town to swap the Cougar for another car. Appellant returned to the lake later that evening driving a yellow Pontiac. Appellant told Smith he sold the Cougar. Appellant boasted to Smith that he also bought a yellow Chevy Chevette and showed Smith the car title. Smith noted

---

**1.** We will refer to Mr. Cummings in this opinion as either Cummings or the victim.

appellant's name failed to appear on either side of the title.

On June 23rd, the police discovered a yellow Chevy Chevette missing from the victim's car lot. On June 24th, the police arrested appellant for the theft of the Chevette pursuant to an arrest warrant. When the police searched the immediate area where appellant was arrested, they also found the yellow Pontiac, a torn title to the Chevette and the victim's empty satchel.

On June 24th, Melvin gave police the blood-stained shirt that appellant wore on the day of the victim's disappearance. Blood tests taken of the stains removed from the shirt revealed human blood which matched the victim's blood type. Appellant's blood was determined to be of a different type than that found on the shirt.

On June 25th, appellant gave incriminating statements to the police that led to the discovery of the victim's wallet, which lay empty, except for a driver's license, on the side of the road. On July 4th, appellant gave other incriminating statements to the police that led to the discovery of Cummings' badly decomposed body. Appellant's version of the events in that statement included his admission that he was present when Cummings was murdered and robbed of his wallet.

However, appellant claimed his participation in the brutal killing was minimal. According to appellant's July 4th statement, a man named "Gator" offered to pay appellant $500 to do a "job." Appellant accepted the offer without knowing what the "job" entailed. According to appellant, "Gator" drove appellant in a red and white pickup truck to the country about four or five miles outside of downtown Paris. Near a bridge, "Gator" stopped the truck and appellant saw the victim tied to a tree. They got out of the truck and went over to the victim. At that point, "Gator" approached the victim with a long-bladed knife. The victim reportedly stated, "don't do this to me, please, don't do this to me." Appellant remembered that "Gator" stabbed the victim only twice in the upper abdomen. After the stabbing, both men moved the body from the tree, tied it, and then hid it beside the road in some weeds. "Gator" and appellant then returned to town. On the way, appellant noticed a brown leather wallet sitting on the dash of "Gator's" truck. "Gator" took the wallet from the dash and removed a Texas driver's license belonging to the victim. "Gator" inspected the license and placed it back in the wallet. As they were driving north on 6th Street, "Gator" threw the wallet out of the truck into the weeds along the road.

On July 5th, appellant directed police to the victim's body, abandoned in some weeds several miles from downtown Paris. The victim's trouser pockets were pulled inside out and a small amount of change was found scattered on the ground near the body. The victim's diamond wedding ring and Timex watch were missing.

An autopsy revealed the victim's hands had been bound with electrical cord. While restrained, the victim was stabbed twenty-four times in his chest, at least one of which caused death. The stab wounds were consistent with the dimensions of the knife bearing the name or logo "Old Hickory." The medical examiner estimated the body had been exposed to the elements approximately two weeks before it was recovered.

 Appellant contends the evidence is insufficient to prove he murdered the victim while in the course of committing a robbery. V.T.C.A., Penal Code, Section 19.-03(a)(2). When reviewing the sufficiency of the evidence to support a conviction, we view the evidence in the light most favorable to the jury's verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Duhamel v. State,* 717 S.W.2d 80 (Tex.Cr.App.1986), cert. denied, 480 U.S. 926, 107 S.Ct. 1387, 94 L.Ed.2d 701 (1987).

Here, the State had to prove appellant intended to take the victim's property before, or as, he murdered the victim. See *White v. State,* 779 S.W.2d 809, 815 (Tex.

Cr.App.1989), cert. denied, 495 U.S. 962, 110 S.Ct. 2575, 109 L.Ed.2d 757 (1990); *Ibanez v. State*, 749 S.W.2d 804, 807 (Tex.Cr. App.1986). Here, the overwhelming weight of the evidence indicates appellant killed the victim for his money and other property. Given (1) appellant's statement to police that he was present when the victim was murdered, (2) the victim's wallet, $1,000, diamond wedding ring, and Timex watch were taken from the victim, (3) appellant directed the police to the stolen wallet's exact location, (4) shortly before the victim's disappearance, Melvin saw appellant with the victim's satchel and a knife that was consistent with the dimensions of the knife used to stab the victim, and (5) appellant was seen in possession of a large amount of money the same evening the victim disappeared, we find the evidence supports the State's theory that appellant intentionally murdered the victim in the course of a robbery. See *McGee v. State*, 774 S.W.2d 229, 234–35 (Tex.Cr.App.1989), cert. denied, 494 U.S. 1060, 110 S.Ct. 1535, 108 L.Ed.2d 774 (1990); *Huffman v. State*, 746 S.W.2d 212, 217 (Tex.Cr.App.1989); *Fierro v. State*, 706 S.W.2d 310, 313 (Tex.Cr. App.1986).

It was for the jury to resolve the conflicts in the evidence, and it was not required to believe appellant's story that "Gator" was the primary actor in killing and robbing the victim. The jury was entitled to believe appellant was guilty as either the primary actor or as a party. Appellant's point of error one is overruled.

In his sixth point of error, appellant claims the trial court erred in refusing to suppress two oral statements he gave to police because the statements were obtained in violation of appellant's Fifth and Sixth Amendment rights to counsel.

At issue are the two oral statements appellant gave to the police—the June 25th statement to Police Chief Whitley that led to the discovery of the victim's wallet, and the July 4th statement to Officer Springer that led to the discovery of the victim's body. Appellant filed a pretrial motion to suppress the statements. The trial court conducted a pretrial hearing on the admis-

sibility of the statements pursuant to Article 38.22, Section 5, V.A.C.C.P., and *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). After the hearing, the trial court denied appellant's suppression motion, and made various findings of fact and conclusions of law. The trial court admitted the statements into evidence at appellant's trial through the testimony of Whitley and Springer.

Appellant claims the police violated his Fifth and Sixth Amendment rights to counsel by initiating further interrogation after he clearly invoked his right to counsel. He also claims he at least made an equivocal request for counsel, and the police violated his Fifth and Sixth Amendment rights to counsel by initiating further interrogation about the case without first clarifying appellant's desire for counsel. And, appellant also claims the police violated these same rights by initiating further interrogation without notice to appellant's counsel after appellant had met with counsel who informed the police he was appellant's attorney. The State asserts appellant never invoked his right to counsel and was never represented by counsel; therefore, his subsequent waivers of his Fifth and Sixth Amendment rights to counsel in response to police-initiated interrogation were valid.

█ Before attachment of the Sixth Amendment right to counsel, if an accused clearly invokes his Fifth Amendment right to counsel during custodial interrogation by the police, all interrogation must cease, and any subsequent waiver of counsel, to be effective, must be the product of either accused-initiated communications with the police, or police-initiated communications with the accused in the presence of counsel. *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981); see also *Minnick v. Mississippi*, 498 U.S. 146, 153, 111 S.Ct. 486, 491, 112 L.Ed.2d 489 (1990). However, if the accused's invocation of his right to counsel is equivocal, interrogation may continue for the limited purpose of discovering whether the accused wants to consult an attorney or proceed without an attorney. *Lucas v. State*, 791 S.W.2d 35, 46 (Tex.Cr.App.1989);

*Russell v. State*, 727 S.W.2d 573, 576 (Tex. Cr.App.), cert. denied, 484 U.S. 856, 108 S.Ct. 164, 98 L.Ed.2d 119 (1987). Once an accused invokes his Fifth Amendment right to counsel, this right is invoked for interrogation on the specific crime for which he is suspected and for any other crime and interrogators. See *McNeil v. Wisconsin*, — U.S. —, —, 111 S.Ct. 2204, 2208, 115 L.Ed.2d 158 (1991); *Lucas*, 791 S.W.2d at 45.

■ Once the Sixth Amendment right to counsel attaches, the *Edwards* analysis also applies to custodial statements made by an accused who is not represented by counsel. *Patterson v. Illinois*, 487 U.S. 285, 290–91, 108 S.Ct. 2389, 2393–94, 101 L.Ed.2d 261 (1988); *Michigan v. Jackson*, 475 U.S. 625, 626, 106 S.Ct. 1404, 1405, 89 L.Ed.2d 631 (1986); see also *Lucas*, 791 S.W.2d at 45–46; but compare *McNeil*, — U.S. at —–—, 111 S.Ct. at 2208–2211 (invoking Sixth Amendment right to counsel does not necessarily invoke Fifth Amendment right to counsel). Although the United States Supreme Court has not so expressly held, we held in *Holloway v. State*, 780 S.W.2d 787 (Tex.Cr.App.1989), as a matter of federal constitutional law, that after the Sixth Amendment right to counsel attaches and the accused is represented by counsel, the police may initiate interrogation only through notice to defense counsel, and a defendant's unilateral waiver of his Sixth Amendment right to counsel is invalid under these circumstances. *Holloway*, 780 S.W.2d at 795. Application of the *Holloway* rule does not depend on an accused's invocation of his Fifth or Sixth Amendment rights to counsel, because this rule is designed to preserve the integrity of the attorney-client relationship once it has been established.[2]

See *Holloway*, 780 S.W.2d at 790–91, 794–95. Unlike the Fifth Amendment right to counsel, the Sixth Amendment right to counsel is offense-specific; the Sixth Amendment right to counsel does not attach to an offense for which no adversarial proceedings have begun. See *McNeil*, — U.S. at —, 111 S.Ct. at 2207.

■ When an accused's Sixth Amendment right to counsel attaches to an offense for which adversarial proceedings have begun, he is entitled to the assistance of counsel at each "critical" stage of the prosecution, absent a valid waiver. See *Jackson*, 475 U.S. at 629 n. 3, 106 S.Ct. at 1407 n. 3; *McNeil*, — U.S. at —, 111 S.Ct. at 2207. The determination of whether a particular proceeding is a "critical" stage generally turns on an assessment of the usefulness of counsel to the accused at that particular proceeding. See *Patterson*, 487 U.S. at 298–300, 108 S.Ct. at 2397–99; see also *United States v. Wade*, 388 U.S. 218, 235–39, 87 S.Ct. 1926, 1936–39, 18 L.Ed.2d 1149 (1967). The question of when the Sixth Amendment right to counsel attaches is separate and distinct from the question of whether a certain proceeding is a "critical" stage. See *Jackson*, 475 U.S. at 629 n. 3, 106 S.Ct. at 1407 n. 3.

■ The State has the burden to establish a valid waiver of Fifth and Sixth Amendment rights to counsel. See *Jackson*, 475 U.S. at 633, 106 S.Ct. at 1409. Recognizing that the trial court is the sole factfinder at a suppression hearing, we apply a deferential standard of review to a trial court's findings to determine whether they have evidentiary support in the record. See *Lucas*, 791 S.W.2d at 47.

Here, it is undisputed that each statement resulted from police-initiated interro-

2. *Holloway* was intended to decide what the United States Supreme Court meant in footnote three of *Patterson* where it said, "a distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship takes effect" where an accused's Sixth Amendment right to counsel has attached and he is represented by counsel. See *Patterson*, 487 U.S. at 289 n. 3, 108 S.Ct. at 2393 n. 3; *Holloway*, 780 S.W.2d at 791, 795 (recognizing that *Patterson* was limited to a defendant unrepresented by

counsel); but compare *Brewer v. Williams*, 430 U.S. 387, 403–07, 97 S.Ct. 1232, 1242–43, 51 L.Ed.2d 424 (1977) (suggesting it is possible for a represented defendant, whose Sixth Amendment right to counsel has attached, to validly waive counsel without notice to counsel). *Holloway* is the only guidance we find on what "distinct set of constitutional safeguards" apply to a represented defendant whose Sixth Amendment right to counsel has attached. *Patterson* and *Brewer* really offer no guidance.

gation. What is disputed is whether appellant was represented by counsel and whether he invoked his right to counsel before he gave the statements. To apply the foregoing principles to the facts of this case, we set out the trial court's findings in some detail. Appellant was arrested for the theft of the Chevy Chevette on the morning of June 24, 1985. That afternoon appellant was taken before a magistrate who arraigned appellant for the theft of the Chevette and read him his rights pursuant to Article 15.17, V.A.C.C.P. Later on the afternoon of June 24th, appellant was being interrogated by Paris Police Officer Barnett and Texas Ranger Almond in Barnett's office. During this interrogation, an attorney, Holmes, arrived to see appellant.[3] Holmes met privately with appellant for approximately one and one-half hours during which time Holmes advised appellant not to make any statements to the police.

Upon emerging from that conference, Holmes told the officers present he advised appellant not to make any statements to the police. Holmes did not tell any of the officers not to question appellant, and none of the officers agreed not to question appellant. The trial court also found, *"Mr. Holmes either told the officers he was representing [appellant] or that he was not retained yet but expected to be."*[4] (Emphasis supplied). None of the officers present understood Holmes to be telling them not to question appellant.

Immediately after Holmes left, Barnett resumed questioning appellant. Appellant stated to him that Holmes told him not to talk to the police. Barnett stated to appellant, *"Well he may be your lawyer, he's your employee, you know. It's up to you."* (Emphasis supplied). Appellant then resumed talking to Barnett but gave

him no information of any significance during this interview.

The next day, June 25th, appellant was again taken before a magistrate who arraigned appellant for burglary of a habitation and read him his rights pursuant to Article 15.17, V.A.C.C.P. Later that day, Chief Whitley of the Paris Police Department interrogated appellant and obtained incriminating statements that led to the discovery of the victim's wallet.

Between June 25, 1985, and July 4, 1985, appellant gave various statements to various police officers none of which were very significant to the case, and the vast majority of them turned out to be false. Appellant initiated some of these interrogations, and the police initiated some of them.

On July 4, 1985, Detective Springer of the Paris Police Department initiated questioning of appellant. Appellant gave incriminating statements during this interview that led to the discovery of the victim's body.

Concerning both statements, the trial court found that appellant never invoked his right to counsel or accepted Holmes as his attorney, and that appellant was repeatedly given *Miranda* warnings and intelligently waived them under no coercion or improper influence from the police. The trial court also found that appellant never showed a desire to follow Holmes' advice not to talk to the police or to deal with the police only through Holmes. The trial court further found that appellant deliberately talked to the police in furtherance of a scheme to lead the police on a series of "wild goose chases" for appellant's admitted purpose of providing him with an opportunity to escape.[5]

3. Holmes had been contacted by appellant's ex-mother-in-law who asked him to go to the police station and speak to appellant.

4. The record reflects the trial court formally appointed Holmes to represent appellant on the capital murder charges on August 16, 1985. The record also reflects the trial court appointed another attorney to represent appellant on January 23, 1986.

5. At the suppression hearing, appellant proclaimed his innocence, and admitted he made

various false statements to the police. Based on these false statements, appellant hoped the police would take him to various places to look for evidence so appellant could escape and find the real killer. Other evidence presented at the suppression hearing shows appellant led the police to Oklahoma on a "wild goose chase" to look for the victim's body. Later, appellant claimed the body was in Tennessee.

More evidence presented at the suppression hearing indicates that in an attempt to find "Gator," appellant had the police take him to

■ We first must decide whether appellant's Sixth Amendment right to counsel attached to the capital murder offense when he gave the statements at issue. Here, the record reflects that before giving the statements at issue, appellant had been arrested for theft of the Chevy Chevette and arraigned for this offense and for burglary of a habitation. Therefore, his Sixth Amendment right to counsel at least had attached to these two offenses. See *Fuller v. State*, 829 S.W.2d 191, 205 (Tex.Cr.App. 1992) (Sixth Amendment right to counsel attaches when an accused is formally arrested and taken before a magistrate); *Alford v. State*, 788 S.W.2d 436, 439 (Tex. App.—Houston [1st Dist] 1990, no pet.); see also *Jackson*, 475 U.S. at 629 n. 3, 106 S.Ct. 1407 n. 3. Under a strict application of *McNeil*, appellant's Sixth Amendment right to counsel had not attached to the capital murder offense because appellant had neither been arrested or taken before a magistrate for that offense, and no other adversarial proceedings had been commenced against him for that offense. See *McNeil*, —— U.S. at ——, 111 S.Ct. at 2207 (Sixth Amendment right to counsel is offense-specific).[6]

However, we do not find *McNeil* to control here. In *McNeil*, the defendant's Sixth Amendment right to counsel had attached to, and had been invoked for, an armed robbery offense he committed in West Allis, Wisconsin, a suburb of Milwaukee. *Id.* at ——, 111 S.Ct. at 2206. The defendant was confined in the Milwaukee County jail for the West Allis armed robbery offense. *Id.* The defendant was also a suspect in a murder, attempted murder, and armed burglary in Caledonia, Wisconsin. *Id.* Before the commencement of any adversarial proceedings for the Caledonia offenses, a Milwaukee County Sheriff's Department de-

tective questioned defendant about these offenses and obtained incriminating statements. *Id.* at ——, 111 S.Ct. at 2206–2207. The defendant was later charged and convicted for the Caledonia offenses. *Id.* He claimed the police obtained the incriminating statements on the Caledonia offenses in violation of his Sixth Amendment right to counsel. *Id.*

The United States Supreme Court disagreed, and held the defendant's Sixth Amendment right to counsel had not attached to the Caledonia offenses when he gave the incriminating statements because no adversarial proceedings had been commenced against him for those offenses. *Id.* The Court also held the Sixth Amendment right to counsel is offense-specific, and emphasized that the Caledonia offenses involved "new or additional crimes" from the previous West Allis crimes for which the defendant's Sixth Amendment right to counsel had attached.

Here, appellant eventually was charged with capital murder with the aggravating element being that he committed the murder in the course of a robbery. V.T.C.A., Penal Code, Section 19.03(a)(1). The State presented evidence of the theft of the Chevette to prove an element of the robbery in the capital murder prosecution. Therefore, unlike *McNeil*, this case involves a situation where appellant's Sixth Amendment right to counsel had attached to an important element of an offense that was later used to aggravate murder to capital murder. Under these circumstances, the police were not investigating "new or additional crimes" when they obtained incriminating statements from appellant about the capital murder; adversarial proceedings had begun against appellant on at least one important element of the offense for which he

various bars where they bought him drinks to make his cover look good. Of course, the spin the State puts on this evidence is that appellant was "playing games" with them for his own purposes, and he did not want any interference from Holmes. The spin appellant puts on this evidence is that the police got appellant intoxicated in an attempt to elicit incriminating statements from him.

6. In *Wilkerson v. State*, 657 S.W.2d 784, 791 (Tex.Cr.App.1983), cert. denied, 470 U.S. 1008, 105 S.Ct. 1371, 84 L.Ed.2d 390 (1985), we left open the question of whether an accused's representation by counsel, when adversary proceedings had not yet begun, alone activated his Sixth Amendment right to counsel. We discuss the issue of appellant's representation by counsel later in this opinion.

was later charged. See *id.* at ——, 111 S.Ct. at 2207.

Also, in *McNeil*, it was unlikely the statements the police obtained in the Caledonia offenses would have affected or impacted the prosecution in the West Allis offenses, and vice versa. Here, however, the theft of the Chevette offense was so closely related to the subsequent capital murder offense that the theft offense was eventually used to aggravate the murder to capital murder.

And, there exists a potential for governmental abuse were we to reject appellant's Sixth Amendment claim on the basis of *McNeil*. In a situation like here, the police intentionally could circumvent Sixth Amendment rights by charging predicate crimes with the purpose of questioning a suspect on an aggravated crime. The potential for such abuse is not at all apparent in *McNeil*. For the foregoing reasons, we find *McNeil* inapplicable.

We also find police interrogation of appellant was a "critical" stage for Sixth Amendment purposes. See *Holloway*, 780 S.W.2d at 793. Therefore, we hold appellant's Sixth Amendment right to counsel had attached to the capital murder offense when he gave the two statements at issue, and he was entitled to the assistance of counsel during the interrogations absent a valid waiver. See *Jackson*, 475 U.S. at 629 n. 3, 106 S.Ct. at 1407 n. 3.

■ We now discuss whether appellant was represented by counsel when he gave the two statements. The trial court found that after Holmes first spoke with appellant in Barnett's office, Holmes told the officers present either that he represented appellant or he expected to be.

At the suppression hearing, Holmes testified that on the day of appellant's arrest on June 24th, appellant's ex-mother-in-law hired him to go to the police station to speak to appellant. He testified he advised appellant that he was appellant's attorney and that appellant should not talk to the

police. Holmes testified he represented appellant until January 1986. Holmes also testified he immediately advised the officers present he was appellant's attorney. Holmes also testified that at this time one of the officers commented that appellant would not be giving any more statements now that he had talked to an attorney. Holmes received payment on behalf of appellant from appellant's ex-mother-in-law on June 26, 1985.

The State did not cross-examine Holmes on the issue of his representation of appellant. The State established on cross-examination that between June 25th and July 4th, Holmes never told the police not to talk to appellant. On redirect, Holmes testified he never told the police not to talk to appellant because appellant denied to Holmes he was talking to the police.

Appellant provided no direct testimony on the issue of Holmes' representation of him, and the State did not cross-examine appellant on that issue.[7] Appellant also testified Holmes advised him not to talk to the police. Appellant testified he did not tell Holmes he was talking to the police because various police officers told him something bad would happen to him if he did.[8] Of course, appellant testified about the false statements he gave to further his scheme to escape so he could find the real killer.

Barnett testified that on June 24th, after Holmes spoke with appellant in Barnett's office, Holmes told the officers present he did not represent appellant at that time "but he thought he would be," or "something to that affect, not those exact words." Springer testified he was under the impression Holmes had been representing appellant since June 24th.

To the extent the trial court found that Holmes was not representing appellant when he gave the two statements, we find the record does not support such a finding. Holmes testified he was representing appellant, and he actually received payment

---

**7.** During its cross-examination of appellant, the State did refer to Holmes as appellant's lawyer.

**8.** The trial court found that the police never threatened appellant, and this finding is supported by the record.

for his services two days later. Springer, the officer to whom appellant gave the July 4th statement, testified he was under the impression appellant was represented by counsel since June 24th. Barnett was not sure what Holmes said. The record further reflects that Holmes was formally appointed by the trial court to represent appellant on the capital murder charges in August 1985, and that another attorney was appointed to represent appellant in January 1986. The overwhelming weight of the evidence supports a finding that appellant was represented by counsel when he gave the two statements.

 Therefore, the relevant facts necessary to dispose of this point of error are that the police initiated interrogation with appellant, who was represented by counsel, after appellant's Sixth Amendment right to counsel had attached to the capital murder offense. In *Holloway*, we held that when an attorney-client relationship has been established after a defendant's Sixth Amendment right to counsel attaches, the police may initiate interrogation only through notice to defense counsel. See *id.* at 794–95; see also *Patterson*, 487 U.S. at 289 n. 3, 108 S.Ct. at 2393 n. 3. That was not done here. Therefore, the two statements were taken in violation of appellant's Sixth Amendment right to counsel.

The State seems to argue no attorney-client relationship had been established because appellant never accepted Holmes as his attorney. The State points to the evidence in the record concerning appellant's escape plan and his conscious desire not to have any interference from Holmes. Here, however, all the evidence points to the fact that an attorney-client relationship had been established. The State had the opportunity, but did not exercise it, to cross-examine Holmes and appellant at the suppression hearing on whether appellant had

accepted Holmes as his attorney. The State failed to carry its burden of proof on this issue. See *Wilkerson*, 657 S.W.2d at 793.

 Assuming the State established no attorney-client relationship from the evidence of appellant's conscious desire to deal with the police without interference from Holmes, we would have to decide whether the statements were taken in violation of appellant's Fifth Amendment right to counsel under an *Edwards v. Arizona* and *Lucas v. State* analysis. Although the trial court found appellant never clearly invoked his right to counsel, the uncontroverted testimony on the circumstances of appellant's meeting with Holmes and the subsequent interrogation establishes appellant at least made an equivocal request for counsel under the Fifth Amendment when, after he spoke to Holmes on June 24th, he told Barnett that Holmes advised him not to make any statements to the police.[9] See *McNeil*, —— U.S. at ——, 111 S.Ct. at 2209 (invocation of Fifth Amendment right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of counsel in dealing with custodial interrogation by the police); compare *Russell*, 727 S.W.2d at 575–76.

We hold Barnett's reply to appellant, " '[W]ell he may be your lawyer, he's your employee, you know. It's up to you,' " was insufficient to clarify whether appellant desired to have Holmes present for questioning, which tainted the entire ensuing interrogation process. Compare *Russell*, 727 S.W.2d at 578 (defendant made equivocal request for counsel during interrogation by inquiring into police officer's opinion on the necessity of counsel, and the interrogating officer sufficiently clarified defendant's desire for counsel by stating he would not

9. The trial court's finding that appellant never clearly invoked his right to counsel arguably is supported by the record. However, appellant argues the circumstances of his meeting with Holmes and his later statement to Barnett that Holmes told him not to make any statements to the police indicate a clear invocation of his Fifth Amendment right to counsel. Compare

*Wilkerson*, 657 S.W.2d at 785–91 (where defendant's counsel met with defendant, who was in custody, and, before leaving, told the officers present not to question defendant, defendant clearly asserted his Fifth Amendment right to counsel). We find it unnecessary to decide whether appellant clearly invoked his right to counsel.

express an opinion and defendant had the right to have counsel present, and then asking whether defendant wanted to continue the interview).

Finally, we cannot say that introduction of the statements into evidence was harmless beyond a reasonable doubt. See *Satterwhite v. Texas*, 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988). Our review of the record indicates these statements constituted a major portion of the State's case.

Appellant's sixth point of error is sustained. Due to our disposition of appellant's first and sixth points of error, we find it unnecessary to address appellant's remaining points of error.

We reverse the trial court's judgment, and remand the cause for a new trial.