# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-05-00465-CR

**Luke Masood Arabzadegan, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 403RD JUDICIAL DISTRICT
### NO. D-1-DC-02-500454, HONORABLE BRENDA KENNEDY, JUDGE PRESIDING

### O P I N I O N

Appellant Luke Masood Arabzadegan pleaded guilty to murder. He was convicted and sentenced by the court to forty-five years in prison. Arabzadegan appeals his conviction complaining that the district court improperly denied his motion to suppress a videotaped confession he gave to investigating officers shortly after his arrest. In a single point of error, he contends that the confession was the result of an interrogation conducted in violation of his right to counsel under the Sixth Amendment to the United States Constitution and Article I, section 10 of the Texas Constitution.[1] We affirm.

---

[1] Appellant does not contend that Article I, section 10 of the Texas Constitution provides broader protection with respect to the right to counsel than the Sixth Amendment. Consequently, we address his complaint in the context of Sixth Amendment jurisprudence.

*Factual and Procedural Background*

Andrew Scott Vigil was found dead in his home on November 26, 2002. His wrists and ankles had been bound with speaker cord. He had been blindfolded, gagged with socks, sprayed with pepper spray, and shocked several times with a stun gun. An autopsy revealed that he had suffocated as a result of a rolled-up sock stuffed into his mouth and tied there with the gag. The coroner ruled the death a homicide. Arabzadegan and two others were implicated in the crime by an anonymous tip. After investigating the tip, the Travis County Sheriff's Department obtained a warrant for Arabzadegan's arrest on December 5, 2002. The warrant was issued by a Travis County district judge based on a five-page affidavit detailing the crime and the evidence against the three men submitted by the lead investigator, Detective Russell Halvorsen. Both the affidavit and warrant accused Arabzadegan of capital murder.

Arabzadegan was arrested in the Austin area on December 12, 2002, at 4:10 p.m.[2] He was arrested at the apartment of a friend. At the time of the arrest, at least two other people were present in the apartment, a woman and a male friend of Arabzadegan's. Both were interviewed, but neither detained. After the arrest, Arabzadegan was driven immediately to the Travis County central booking facility, arriving at 4:50 p.m. He was then taken directly to an interrogation room before being booked into the computer system. In the interrogation room, Arabzadegan was read his *Miranda* warnings and supplied a "blue card" with the warnings written on it for him to read and sign. Arabzadegan then acknowledged the *Miranda* warnings, waived his rights, expressly declined

---

[2] Immediately after the crime, he and the other two men fled the Austin area and went to New Orleans. However, Arabzadegan's stay in New Orleans was brief and he returned to the Austin area at some point before December 12.

the right to consult an attorney, signed the "blue card" acknowledging the waiver, and answered questions put to him by the officers in a manner that constituted a confession. The entire interview was videotaped and lasted an hour and ten minutes, concluding at approximately 6:00 p.m.

Arabzadegan filed a pretrial motion to suppress the confession. The trial court held a hearing and took evidence on the motion. Evidence at the hearing established that, after Arabzadegan became a suspect but before he was arrested, Detective Halvorsen received a telephone call from Austin criminal defense attorney Joe Turner. According to Detective Halvorsen, Turner indicated that either he or his firm "would probably be the attorneys of record" and "would be working on the case."[3] Josh Saegert, an attorney with Turner's firm, testified that, after Arabzadegan

---

[3] The only evidence of this telephone conversation comes from the defense's cross-examination of Detective Halvorsen at the hearing on the motion to suppress. We quote the relevant portion of the testimony in its entirety.

> Q. Now, in that period where you knew he was a suspect but he hadn't yet been arrested, you got a call from Joe Turner; is that right?
>
> A. I recall—I think so, saying that he might have been retained as an attorney.
>
> Q. That the family contacted him and he had been retained as attorney. If it happened, That's what you remember?
>
> A. Well, I don't know if your client retained him or his family retained him.
>
> Q. Okay. So but you were aware that we were going to probably be the attorneys of record?
>
> A. I got a phone call from Joe Turner. Whether or not that was true or not, I don't know. Okay. At least that's what he told me. And I think Mr. Turner told me he hadn't been paid yet, so that doesn't mean a whole lot when you haven't been paid yet, as an attorney.
>
> Q. But, I mean the gist of the phone call was not about search or seizure or some kind of, like, legal issue; it was to indicate that we were going to be working on the case?

was arrested, Turner was notified and he sent Saegert to meet with Arabzadegan.[4]  Saegert arrived at central booking sometime between 5:00 p.m. and 5:30 p.m. and demanded to see Arabzadegan. The sheriff's deputies at the front desk told Saegert that they did not have any record of Arabzadegan in their computer system.  Saegert told the deputies that he believed Arabzadegan was in custody and demanded that they locate him so that Saegert could have access to him.  The deputies provided Saegert with telephone numbers for Detective Halvorsen and the head of the Major Crimes Unit, Lieutenant Art Cardenas.  While he waited, Saegert telephoned Halvorsen, the sheriff's office dispatch (to talk to the arresting officer), and Cardenas and left messages.  The message for Halvorsen was left at 5:38 p.m. at his Austin office[5], the message for the arresting officer was left at 5:45 p.m., and the message for Cardenas was left at 5:55 p.m. according to notes made by Saegert at the time.  Lieutenant Cardenas returned Saegert's call at approximately 6:00 p.m. and confirmed

---

A.      That you, possibly, yes.

Q.      But there was—if there was a point to the phone call, that was it?

A.      That was it.  That was the point.

Turner did not testify regarding the conversation.  No other evidence regarding the conversation was offered by either the prosecution or the defense.

[4] Saegert testified that Arabzadegan's family had retained the firm on December 9th or 10th. There was no evidence that Arabzadegan had any contact with the firm or its lawyers prior to his arrest.  There was no evidence that Arabzadegan had agreed to retain Turner or his firm prior to his arrest.

[5]  Halvorsen was in New Orleans at the time of the arrest and confession.  He was made aware of the arrest when it occurred, but was unaware of the details of the interrogation until after the fact.

that Arabzadegan was in custody. Saegert then met with Arabzadegan. However, the interrogation was over and the videotaped confession had been recorded.

The trial court denied Arabzadegan's motion to suppress the videotaped confession. Arabzadegan then pleaded guilty to the lesser included offense of murder and was sentenced by the court to 45 years' imprisonment.

Arabzadegan's complaint on appeal is that his videotaped confession was obtained in violation of his Sixth Amendment right to counsel, and the trial court should have granted his motion to suppress. More specifically, he argues that his waiver of counsel at the beginning of his interrogation was invalid because his Sixth Amendment rights had attached, he was represented by counsel at the time of the waiver, and he made the waiver without the benefit of counsel. *See Michigan v. Jackson*, 475 U.S. 625, 636 (1986); *Upton v. State*, 853 S.W.2d 548, 553 (Tex. Crim. App. 1993); *Holloway v. State*, 780 S.W.2d 787, 795 (Tex. Crim. App. 1989). We conduct a two-step analysis to address this complaint. First, had Arabzadegan's Sixth Amendment rights attached at the time of the interrogation? If not, then there is no constitutional violation. Second, if his Sixth Amendment rights had attached when he was interrogated, was his waiver of his right to counsel during the interrogation valid?

In reviewing a ruling on a motion to suppress, we give almost total deference to the trial court's determination of historical facts. *Balentine v. State*, 71 S.W.3d 763, 768 (Tex. Crim. App. 2002). We review de novo mixed questions of law and fact that do not turn on an evaluation of credibility and demeanor. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We must affirm the trial court's ruling if it can be upheld on any valid theory of law

applicable to the case—even if the trial court did not base its decision on the applicable theory. *See State v. Steelman*, 93 S.W.3d 102, 107 (Tex. Crim. App. 2002).

***Attachment of Sixth Amendment Rights***

We first determine whether Arabzadegan's Sixth Amendment right to counsel had attached at the time he was interrogated. The Sixth Amendment right to counsel attaches at the initiation of adversarial judicial proceedings whether by way of formal charge, preliminary hearing, indictment, information, or arraignment. *Brewer v. Williams*, 430 U.S. 387, 398 (1977) (quoting *Kirby v. Illinois*, 406 U.S. 682, 689 (1972) (plurality opinion)); *Robinson v. State*, 851 S.W.2d 216, 224 (Tex. Crim. App. 1991). "[T]he Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a 'medium' between him and the State." *Maine v. Moulton*, 474 U.S. 159, 176 (1985). After a formal charge is made, a person ceases being a "suspect" and becomes an "accused." The government has committed itself to prosecute and formalized its adversarial position with respect to the defendant. *Kirby*, 406 U.S. at 689. The defendant then "finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." *Id.* The Supreme Court reiterated this point in *Moran v. Burbine*: "It is clear, of course, that, absent a valid waiver, the defendant has the right to the presence of an attorney during any interrogation occurring after the first formal charging proceeding, the point at which the Sixth Amendment right to counsel initially attaches." 475 U.S. 412, 425 (1986).

Following this authority, Texas courts have held that adversarial judicial proceedings have commenced when a person is arrested pursuant to a warrant obtained through a complaint filed

with a court. *See Barnhill v. State*, 657 S.W.2d 131, 132 (Tex. Crim. App. 1983) (formal judicial criminal proceedings had been instituted against the accused by the filing of a felony complaint in justice court); *see also Green v. State*, 872 S.W.2d 717, 720 (Tex. Crim. App. 1994) (noting that *Barnhill* is "consistent with, if not dictated by," United States Supreme Court authority to treat the filing of a felony complaint as a point after which adversarial judicial proceedings have commenced); *Terrell v. State*, 891 S.W.2d 307, 312 (Tex. App.—El Paso 1994, pet. ref'd); *Dams v. State*, 872 S.W.2d 325, 328 (Tex. App.—Beaumont 1994, no pet.). In this case, a felony complaint was submitted to a district court accusing Arabzadegan of capital murder and a warrant was issued for his arrest. The police then arrested Arabzadegan on the basis of this warrant and initiated an interrogation that resulted in a confession. We hold that the State initiated formal judicial proceedings against Arabzadegan with the filing of the felony complaint accusing him of capital murder. *Id.* Consequently, Arabzadegan's Sixth Amendment right to assistance of counsel had attached at the time of the interrogation, and he was entitled to the assistance of counsel prior to answering questions unless he validly waived such right. *Id.*

***Waiver of Right to Counsel***

There is no dispute that the officers who interrogated Arabzadegan apprised him of his right to counsel and delivered the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966). There is also no dispute that after receiving these warnings Arabzadegan waived his right to counsel, both orally and in writing, before answering the officer's questions and confessing. However, this is not the end of the inquiry. We must determine whether the waiver is valid. The burden is on the State to prove that such a waiver was made voluntarily, knowingly, and intelligently. *Upton*,

7

853 S.W.2d at 553; *Robinson*, 851 S.W.2d at 224. Waiver is shown as a matter of law with regard to pretrial questioning if an accused (1) who has not yet retained or been appointed counsel (2) decides voluntarily not to rely on his right to counsel and (3) that decision is made with the understanding that he could remain silent and request a lawyer and that the State could use any statement he gave against him. *Robinson*, 851 S.W.2d at 224 (citing *Patterson v. Illinois*, 487 U.S. 285, 297 (1988)). Thus, for a waiver to be valid not only must the waiver be made "voluntarily, knowingly, and intelligently," but the accused must also not have been represented by counsel at the time. *Id.* In *Patterson,* the Supreme Court made the point as follows:

> We note as a matter of some significance that petitioner had not retained, or accepted by appointment, a lawyer to represent him at the time he was questioned by authorities. Once an accused has a lawyer, a distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship takes effect.

487 U.S. at 290 n.3.[6] The Texas Court of Criminal Appeals has interpreted this language as prohibiting the dissolution of an established attorney-client relationship through waiver without the involvement of counsel. *Holloway*, 780 S.W.2d at 794-95. Thus, once an accused's Sixth Amendment right to counsel has attached, if he is represented by counsel—whether retained or appointed by the court—the police may initiate interrogation only through notice to defense counsel,

---

[6] The court went on to note that "the analysis changes markedly once an accused even *requests* the assistance of counsel" citing *Michigan v. Jackson*, 474 U.S. 625 (1986). *Patterson v. Illinois*, 487 U.S. 285, 290 n.3 (1988). There is no dispute in this case that Arabzadegan did not request assistance of counsel or otherwise attempt to invoke his Sixth Amendment rights during his interrogation.

8

and a defendant's unilateral waiver of his Sixth Amendment right to assistance of counsel is invalid. *Upton*, 853 S.W.2d at 553; *Holloway*, 780 S.W.2d at 794-95; *see also Patterson*, 487 U.S. at 289.

Arabzadegan argues that his waiver of the right to counsel prior to his interrogation was not valid because he was represented by criminal defense lawyer Joe Turner and his firm at the time of the waiver and his counsel was not notified of either the interrogation or the waiver. There is no dispute that the police did not notify anyone as counsel for Arabzadegan prior to obtaining his waiver or conducting the questioning that resulted in a confession. Therefore, the relevant questions are whether Arabzadegan was, in fact, represented by counsel at the time of his waiver and whether the police had either actual or constructive notice that Arabzadegan was represented. If so, the waiver was ineffective and the confession inadmissible. If Arabzadegan was not represented by counsel or the police were not put on notice of the representation, the waiver was valid and the trial court's denial of the motion to suppress the confession was appropriate.[7]

The question of whether Arabzadegan was represented by retained counsel at the time of his interrogation and waiver of right to counsel turns on whether he had established an attorney-client relationship with Turner or a lawyer in his firm. *Plattenburg v. State*, 972 S.W.3d 913, 917 (Tex. App.—Beaumont 1998, pet. ref'd); *Terrell*, 891 S.W.2d at 313; *Dams*, 872 S.W.2d at 328. An attorney-client relationship is a contractual relationship and results from the mutual agreement

---

[7] The concurrence argues that an individual's Sixth Amendment right to counsel is a personal right and must be personally invoked by an accused in some fashion—i.e., the police must be on notice of the accused's desire for a lawyer or the fact that the accused has a lawyer—before a waiver based on *Miranda* warnings will be invalidated for failure to involve the lawyer. This may be the case. However, our determination that there is no evidence that Arabzadegan had an attorney-client relationship at the time of his interrogation is dispositive of this appeal and there is no need for us to reach the issue of how and by whom the Sixth Amendment right to counsel may be invoked.

and understanding of the parties concerned. To establish an attorney-client relationship, the parties must explicitly or by their conduct manifest an intention to create it.[8]  *Hill v. Bartlette*, 181 S.W.3d 541, 547 (Tex. App.—Texarkana 2005, no pet.); *State v. DeAngelis*, 116 S.W.3d 396, 403 (Tex. App.—El Paso 2003, no pet.); *Stephenson v. LeBoeuf*, 16 S.W.3d 829, 836 (Tex. App.—Houston [14th Dist.] 2000, pet. denied); *Vinson & Elkins v. Moran*, 946 S.W.2d 381, 405 (Tex. App.—Houston [14th Dist.] 1997, writ dism'd by agr.); *Terrell*, 891 S.W.2d at 313; *Parker v. Carnahan*, 772 S.W.2d 151, 156 (Tex. App.—Texarkana 1989, writ denied).  Thus, there must be evidence in the record upon which the trial court could have found that Arabzadegan and a lawyer with Turner's firm mutually agreed either expressly or by their conduct to establish an attorney-client relationship before Arabzadegan waived his rights and consented to give an inculpatory statement.  *See Upton*, 853 S.W.2d at 556-57; *Plattenburg*, 972 S.W.3d at 917; *Terrell*, 891 S.W.2d at 313; *Dams*, 872 S.W.2d at 328.

The dissent argues that the creation of the attorney-client relationship in the criminal context should not be governed by the same contract-based rules as in other contexts.  We are of the view that—with the exception of court-ordered appointments—the attorney-client relationship in the

---

**8** The issue in this case is whether Arabzadegan had *retained* counsel at the time of his questioning.  Arabzadegan does not claim that he had either requested or been appointed counsel by the court at the time.  His claim is that Turner and his firm were, in fact, his lawyers at the time of his arrest and interrogation because they had been retained by his family.  It is significant that the rule regarding establishment of an attorney-client relationship when counsel is appointed by the court differs from the rule that applies when counsel is retained.  *See Stearnes v. Clinton*, 780 S.W.2d 216, 222 (Tex. Crim. App. 1989) (once an attorney is appointed an attorney-client relationship is established); *see also Holloway v. State*, 780 S.W.2d 787, 795 (Tex. Crim. App. 1989) (an accused who has requested and had counsel appointed to represent him is represented by counsel for the purposes of the Sixth Amendment).

criminal context can only be created by a mutual agreement on the part of both the client and the lawyer. It does not make sense to speak of the existence of an attorney-client relationship where either of the parties concerned has not agreed to the relationship. In the context of a criminal matter where the lawyer is retained rather than appointed, a lawyer cannot be forced on an unwilling client nor can a client be forced on an unwilling lawyer. Thus, there must be a mutual understanding that both parties desire the relationship and intend it to exist. The contractual nature of the creation of the relationship in criminal matters other than court-ordered appointments, therefore, cannot differ from the creation of the relationship in other contexts. The Texas Court of Criminal Appeals has recognized the contractual nature of the creation of the attorney-client relationship in criminal matters (other than court-ordered appointments). *Mixon v. State*, No. PD-0018-06, 2007 Tex. Crim. App. LEXIS 654, at *10-16 (Tex. Crim. App. May 23, 2007); *Upton*, 853 S.W.2d at 556-57; *Strong v. State*, 773 S.W.2d 543, 549 (Tex. Crim. App. 1989); *Green v. State*, 667 S.W.2d 528, 533-34 (Tex. Crim. App. 1984). Other courts of appeals have adopted such an approach in the context of the Sixth Amendment. *Plattenburg*, 972 S.W.3d at 917; *Terrell*, 891 S.W.2d at 313; *Dams*, 872 S.W.2d at 328. We are not aware of any Texas court that has adopted a different standard for the creation of an attorney-client relationship in the criminal context other than for court-ordered appointments.

While it is common for third parties such as family members, friends, or others to help an accused retain the services of a lawyer either before or after arrest, an agreement between an accused's family and a lawyer regarding possible representation does not, by itself, create an attorney-client relationship between that lawyer and the accused. This proposition was considered

11

and rejected by the court in *Terrell*. *See* 891 S.W.2d at 313-14. We are of the same opinion. Until the accused reaches a mutual understanding with the lawyer there can be no attorney-client relationship. Otherwise, third parties could force their choice of a lawyer on an accused regardless of the wishes of the accused and possibly manipulate the process without the knowledge or involvement of either the accused or the State. For example, if third parties could create an attorney-client relationship on behalf of but without the involvement of an accused, criminal organizations or other participants in a crime could effectively nullify statements and/or confessions of their associates who are arrested and voluntarily decide to disclose information simply by contacting and retaining a lawyer on behalf of the associate. The attorney-client relationship cannot work this way for either ill-intentioned criminal associates or well-meaning family members.

We are aware of no authority supporting the notion that a family member or other third party may create an attorney-client relationship on behalf of a competent adult without the person's knowledge or consent.[9] To allow such agreements to bind an accused as well as government officials would abrogate the line of authority recognizing that the attorney-client relationship is a voluntary, contractual relationship resulting from the *mutual* agreement and understanding of the parties concerned. Mutuality is central to any contractual relationship including the attorney-client relationship. As articulated in *Parker v. Carnahan* and following cases, there must be evidence that both sides of such a relationship have agreed to it. *Parker*, 772 S.W.2d at 156.

---

[9] We are not presented in this case and do not consider issues that may arise with the formation of an attorney-client relationship where there is an established caretaker relationship such as parent and minor child, guardianship, etc., between the accused and a third party responsible for his or her interests. We address only the formation of an attorney-client relationship between an attorney and a competent adult.

Evidence that one side may have intended there to be an attorney-client relationship does not prove an agreement, and therefore, does not prove an attorney-client relationship.

The attorney-client relationship, in a retained counsel situation, requires the agreement of both lawyer and client and cannot come into existence until the moment of the mutual understanding. A competent adult arrested and accused of a crime is absolutely entitled to reject any lawyer recruited by third parties. In other words, such an accused is free to enter into an attorney-client relationship of his or her choosing and at his or her option. This point can be illustrated by imagining that Arabzadegan had not wanted to retain Joe Turner's firm as his lawyers. If, after meeting with Saegert, Arabzadegan had decided not to retain Turner's firm, would there be any question that an attorney-client relationship ever existed between Arabzadegan and any member of Turner's firm? We do not think so and the reason would be Arabzadegan's failure to agree to it. The converse is also true. A lawyer, outside of the court-ordered appointment context, is entitled to provide services to a potential client at his or her option. No attorney-client relationship is created for the purposes of professional responsibility until the lawyer has agreed to it. *See Green*, 667 S.W.2d at 533 (attorney-client relationship not created when lawyer declined the representation after initial consultation). Thus, it is necessary for *both* lawyer and client to agree to the creation of the relationship before it can be said to exist. In this case, Arabzadegan, not even knowing of the

existence of Saegert and Turner's firm until after his confession, could not possibly have agreed to

an attorney-client relationship with them until after his confession.[10]

---

[10] The dissent suggests that an accused must be given a reasonable opportunity to knowingly decline the assistance of a lawyer recruited by third parties, and that the police in this case failed to give Arabzadegan such an opportunity by keeping the existence of the lawyer recruited by his family secret from him. Presumably, this means the police have a duty to inform an accused that a lawyer recruited by third parties is trying to see the accused (if they know this is happening) even if the accused has not requested an attorney or in any manner invoked his right to counsel. As articulated by the concurrence, this proposition is problematic. Nonetheless, the record in this case does not support the dissent's concern on this point.

There is no evidence in this record that the police kept the existence of Saegert secret from Arabzadegan. Saegert arrived at Travis County Central Booking and requested to see Arabzadegan sometime between 5:00 p.m. and 5:30 p.m.—after the interrogation had begun and was in progress. The request to see Arabzadegan was made to two sheriff's deputies on duty who were unaware of Arabzadegan's presence in the building. Their review of the records available to them did not disclose Arabzadegan's presence. Saegert asked to speak to a supervisor, and the deputies gave Saegert telephone numbers for Detective Halvorsen and Lieutenant Cardenas. Saegert called Detective Halvorsen and left a message for him at 5:38 p.m. Halvorsen was in New Orleans at the time and did not return the call. Saegert then called the Travis County Sheriff's Office dispatch and left a message for the arresting officer. According to Saegert's notes, he left this message at 5:45 p.m. Saegert then called Lieutenant Cardenas and left a message at 5:55 p.m., which Lieutenant Cardenas returned at approximately 6:00 p.m. Saegert was given immediate access to Arabzadegan, who had already given his statement. There is no evidence in this record of malfeasance on the part of either side. There is no evidence that anyone with the Travis County Sheriff's Office misled Saegert or that the interrogating officers were aware of Saegert's efforts before he spoke to Lt. Cardenas. Saegert was diligent in his efforts to see Arabzadegan and the police conducted their investigation in the ordinary way. Arabzadegan could have halted the process at any time by invoking his right to counsel or otherwise declining to give a statement, but he did not. There may be a case where intentional police misconduct in sequestering an accused raises additional constitutional issues. This is not that case.

The dissent's position highlights the lack of an attorney-client relationship between Arabzadegan and any lawyer at the time Arabzadegan gave his confession. While Arabzadegan had the right to counsel at the time of his interrogation, he also had the right to decline the assistance of counsel unless he already had a lawyer. There is no question that Arabzadegan knowingly and voluntarily declined the assistance of counsel. This waiver is valid unless an attorney-client relationship is in place at the time of the waiver. There is also no dispute that Arabzadegan was unaware of Saegert's existence or that Saegert planned to offer his services at the time he gave his statement. Arguing that the problem is that Arabzadegan should have been given an opportunity to decline the assistance of Saegert is to acknowledge that no attorney-client relationship existed between them at the time.

14

At the hearing on the motion to suppress, there was no evidence of an agreement or understanding between the lawyers and Arabzadegan prior to his initial meeting with Saegert. Indeed, there was no evidence of any intention on Arabzadegan's part to participate in an attorney-client relationship with anyone before his arrest or during his interrogation. There was no evidence that Arabzadegan retained Turner or was even aware that Turner had been or was going to be retained. Nor was there any evidence that Turner or another lawyer with his firm had any contact with Arabzadegan before Saegert met with him immediately after the interrogation.

The only evidence offered was to the effect that (1) Arabzadegan's family contacted Turner before Arabzadegan had been found and asked Turner to serve as the lawyer whenever Arabzadegan was arrested, (2) Turner told a detective that he was going to do that, and (3) a lawyer from Turner's firm went to the police station to meet with Arabzadegan shortly after he was arrested. This evidence reveals something about the lawyer side of the required mutual understanding. However, it does not reveal anything regarding what Arabzadegan did or intended or agreed to with respect to retaining a lawyer and creating an attorney-client relationship. In short, there is no evidence in this record of any agreement—either express or by conduct—between Arabzadegan and a lawyer that establishes an attorney-client relationship between them at the time Arabzadegan waived his rights and confessed.

Although the burden is on the State to prove that a waiver of Sixth Amendment rights was voluntarily, knowingly, and intelligently made, this obligation cannot include requiring the State to prove that an accused *did not* have retained counsel at the time of an interrogation. Since the essence of a retained counsel attorney-client relationship is a mutual agreement between the lawyer and the accused, the evidence necessary to demonstrate or negate such a relationship is uniquely in

15

the hands of the accused and his or her lawyer. If the State were obligated to negate any attorney-client relationship as part of demonstrating a voluntary waiver, either the information about an accused's relationship with his lawyer, including sensitive details about how and when the relationship was formed, would have to be subject to compulsory disclosure to the State or the court would have to deny the State the ability to secure the only evidence available to carry its burden in order to protect an accused's right to remain silent. Even if such disclosure or inquiry were allowed, proving that a mutual agreement between two adversarial parties *did not exist*, when the information needed is often unwritten and neither of the parties involved desires to disclose information about the relationship, would likely be not only an impossible burden, but also subject to many avenues of potentially fraudulent manipulation.

We are of the view that the better approach when an accused challenges the validity of a unilateral waiver of his or her Sixth Amendment right to counsel on the basis of the existence of an attorney-client relationship is to place the initial burden of showing the existence of such a relationship on the accused. This approach better matches the burden of proof to the source of the information necessary to carry the burden, avoids issues with the State seeking invasive discovery or inquiry in an area traditionally deemed confidential unless the accused elects to open the door, and avoids the complicated legal problem of requiring a party to prove a negative (that an attorney-client relationship does not exist). This does not abrogate or affect the prosecution's burden to prove that an accused's waiver of Sixth Amendment rights was knowing, voluntary, and intelligent on the part of the accused. Rather, if an accused wishes to invalidate an otherwise valid unilateral waiver by showing that an attorney-client relationship existed between him or her and an attorney when the waiver was made, but the accused failed to disclose the relationship to investigating officers at the

16

time of the waiver, the burden will shift to the accused to put on evidence of the existence of the attorney-client relationship. If there is no evidence to support a finding that an attorney-client relationship existed at the time of an otherwise valid waiver of the Sixth Amendment right to counsel or if the record is silent as to whether the accused had an attorney-client relationship at the time, then the waiver will not be invalidated on the basis that counsel was not involved.

The San Antonio Court of Appeals stated in *Cloer v. State* that in a Sixth Amendment waiver context "the State has the burden to prove that the attorney-client relationship had not been established" relying on language in the Texas Court of Criminal Appeals's opinion in *Upton v. State*. *Cloer v. State*, 88 S.W.3d 285, 289 (Tex. App.—San Antonio 2002, no pet.). The *Cloer* court apparently came to this conclusion because the *Upton* court—as part of its discussion finding that an attorney-client relationship did exist in that case—stated, "The State failed to carry its burden of proof on this issue." 853 S.W.2d at 557. There are two problems with the statement in *Cloer*.

First, the statement in *Cloer* regarding the burden of proof was not necessary to the analysis or the result in that case. The accused in *Cloer* had been appointed counsel. As noted previously, Texas law recognizes that, in the court-ordered appointment context, an attorney-client relationship is established for the purposes of the Sixth Amendment when an attorney is appointed to represent an accused. *See Stearnes*, 780 S.W.2d at 222; *see also Holloway*, 780 S.W.2d at 795. Thus, there was no real issue in *Cloer* as to whether the accused had an attorney-client relationship with a lawyer. Since it was undisputed that the accused in *Cloer* had a court-appointed attorney and, therefore, had an established attorney-client relationship, it was unnecessary for the *Cloer* court to offer any opinion on the questions of whether the accused had "accepted" the appointed lawyer as his attorney and whether the State had to prove that he had not.

17

Second, the *Cloer* opinion overstates the meaning of the language in *Upton* relating to the State's failure to carry its burden of proof. The accused and his lawyer in the *Upton* case testified regarding the existence of an attorney-client relationship at the time of the interrogation in that case . The State failed to cross-examine either the accused or his lawyer, or otherwise rebut this evidence. After noting this record, the *Upton* court stated, "The State failed to carry its burden of proof on this issue." 853 S.W.2d at 557. Was this a failure by the State to carry its burden of proof to negate the existence of an attorney-client relationship or was this a failure by the State to carry its burden to conclusively rebut the evidence put on by the accused? We believe the better reading of the *Upton* court's holding is that the State failed to carry its burden to rebut the evidence of an attorney-client relationship presented by the accused.

We do not believe that the Texas Court of Criminal Appeals intended *Upton* to require the State to negate the existence of an attorney-client relationship in all cases where a statement and/or confession is given after an otherwise valid waiver of rights. If so, in any case in which an uncounseled confession or statement is obtained after a waiver of rights, the defendant would simply have to move to suppress the statement claiming the waiver was invalid and then sit silent. The State would then have the obligation to prove not only that the waiver was made knowingly, voluntarily, and intelligently, but also that the accused did not have an attorney-client relationship with any lawyer at the time. Unless the State produces evidence negating the existence of any attorney-client relationship, the accused, without presenting any evidence that he had a lawyer, could claim that the statement must be suppressed because the State failed to prove that he *did not* have a lawyer at the time of the confession. In such circumstances, the *absence of evidence* as to whether the accused had a lawyer at the time of the confession or statement would mean that the confession or statement must be suppressed. This would amount to a presumption that every

18

accused or arrestee always has a lawyer. If we must presume that every arrested person has a lawyer, then no uncounseled confession or statement will be admissible unless the State conclusively rebuts that presumption. We do not believe that either the Sixth Amendment or the *Upton* opinion contemplates or requires such a presumption. Rather, in our view, the accused is required to raise a challenge to an otherwise valid waiver of Sixth Amendment rights by asserting the existence of an attorney-client relationship, and the accused also has the initial burden of persuasion with respect to the existence of such a relationship.[11] The State is then allowed to attempt to rebut that proof if there is a dispute.[12]

The fact that Arabzadegan entered into an attorney-client relationship with Turner's firm after the interrogation at issue is not relevant to the analysis. The Sixth Amendment protects the integrity of an established attorney-client relationship. It does not presume such a relationship. As the Supreme Court stated in *Patterson v. Illinois*:

> Preserving the integrity of an accused's choice to communicate with police only through counsel is the essence of *Edwards* [*v. Arizona*, 451 U.S. 477 (1981)] and its progeny—not barring an accused from making an *initial* election as to whether he will face the State's officers during questioning with the aid of counsel, or go it alone. If an accused "knowingly and intelligently" pursues the latter course, we see no reason why the uncounseled statements he then makes must be excluded at his trial.

---

[11] For example, as in *Cloer*, it would be enough for an accused who had an appointed lawyer at the time of a unilateral waiver of Sixth Amendment rights to show that the appointment occurred prior to the waiver. In a retained counsel scenario, the accused would be required to present evidence that he or she had an attorney-client relationship (i.e. a mutual understanding) with retained counsel at the time of an otherwise valid unilateral waiver.

[12] Because we find that there is no evidence of an attorney-client relationship at the time of the waiver in this case and that this finding is dispositive, we express no opinion as to the effect that an undisclosed, but later proven, retained counsel relationship might have on a unilateral waiver of Sixth Amendment rights.

487 U.S. at 292 (emphasis in original). Arabzadegan was free to have retained a lawyer before he was arrested and to rely on that lawyer to act as a medium between him and the State, or to have requested assistance of counsel before answering questions and confessing. In either event, the interrogating officers would have been obligated not to interfere with his efforts to exercise his right to assistance of counsel. *Moran*, 475 U.S. at 428. However, there was no evidence he did either. He was, therefore, an accused who made the election to "go it alone" at the interrogation that resulted in his confession. *See Patterson*, 487 U.S. at 293.[13] The fact that he retained counsel after the waiver of rights and interrogation does not change the fact that he made the initial election to communicate with law enforcement without the assistance of counsel—a decision he was free to

---

[13] The dissent argues that the result in this case is inconsistent with the United States Supreme Court's holding in *Moran v. Burbine*, noting that there had not been contact between the lawyer recruited by Burbine's sister and Burbine before he made the incriminating statement at issue in that case. *See Moran v. Burbine*, 475 U.S. 412, 417 (1986). However, *Moran v. Burbine* did not turn on the question of whether an attorney-client relationship existed between Burbine and the lawyer recruited by his sister. The Court was very careful to point out that it was offering no opinion as to whether an attorney-client relationship existed or whether such a relationship would have any impact on the matter because the Court found that Burbine's Sixth Amendment right to counsel had not yet attached. *Moran*, 475 U.S. at 428-29. Interestingly, the prosecution in *Moran* was willing to concede the existence of an attorney-client relationship at the relevant time for the purposes of its appeal to the United States Supreme Court even though the Rhode Island Supreme Court had expressly found as a matter of Rhode Island law no attorney-client relationship had existed. The United States Supreme Court would not accept the concession in light of the Rhode Island Supreme Court's interpretation of Rhode Island law. However, the Court noted that the question was not relevant to their decision in *Moran* stating that the issue before it did not "focus on whether an attorney-client relationship actually existed as a formal matter of state law." *Id.* at 429. Rather, the outcome would be the same whether such a relationship existed or not because Burbine's Sixth Amendment rights had not attached. After stating that the question of whether an attorney-client relationship existed between Burbine and the lawyer recruited by his sister was irrelevant to their decision in that case, the Court went on to reject the notion that an attorney-client relationship—a creature of state law—could independently trigger the federal Sixth Amendment right to counsel. *Id.* The Court noted that the type of circumstances that would give rise to the Sixth Amendment right to counsel would certainly have a federal definition as opposed to relying on the creation of an attorney-client relationship pursuant to state law. *Id.* Thus, *Moran v. Burbine* not only does not aid in the analysis here, the opinion expressly declined to address the issue presented by this case.

20

make on his own because he was a competent adult not represented by counsel at the time. *See Upton*, 853 S.W.2d at 553; *Holloway*, 780 S.W.2d at 794-95; *see also Patterson*, 487 U.S. at 289.

Unless an attorney-client relationship existed between Arabzadegan and a lawyer with Turner's firm, Arabzadegan was free to unilaterally waive his Sixth Amendment right to assistance of counsel without notice to or the involvement of counsel, and he elected to do so. There is no evidence in this record that such an attorney-client relationship existed. We see no reason why his uncounseled confession must be excluded under these circumstances. Consequently, we hold that the trial court did not err in denying the motion to suppress.

We overrule Arabzadegan's point of error, affirm the order of the trial court denying Arabzadegan's motion to suppress, and affirm the trial court's judgment.

_____

G. Alan Waldrop, Justice

Before Justices Puryear, Waldrop and B. A. Smith*;
   Concurring Opinion by Justice Puryear
   Dissenting Opinion by Justice B. A. Smith*

Affirmed

Filed: July 18, 2007

Publish

*Before Bea Ann Smith, Justice (retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 2005).