

# NUMBER 13-22-00352-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

ANGEL HERRERA,          Appellant,

v.

THE STATE OF TEXAS,          Appellee.

## ON APPEAL FROM THE 139TH DISTRICT COURT
## OF HIDALGO COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Peña**
**Memorandum Opinion by Chief Justice Contreras**

Appellant Angel Herrera was convicted of murder (first-degree felony), possession of cocaine in an amount of four grams or more but less than 200 grams (second-degree felony), and possession of marijuana in the amount of five pounds or less but more than four ounces (state jail felony). *See* TEX. PENAL CODE ANN. § 19.02(b)(1); TEX. HEALTH & SAFETY CODE ANN. §§ 481.115(d), 481.121(b)(3). The jury sentenced Herrera to sixty-four

years' imprisonment for the murder charge, twenty years' imprisonment for the possession of cocaine charge, and eighteen months' imprisonment for the possession of marijuana charge. The trial court ordered the sentences to run concurrently. By two issues, Herrera argues that (1) there was insufficient evidence to convict him of murder because the State did not rebut his assertion of self-defense beyond a reasonable doubt, and (2) he is entitled to a new trial because exhibits necessary to this appeal were lost or corrupted and could not be authentically duplicated. We affirm.

## I. BACKGROUND

On June 8, 2020, at approximately 12:00 p.m., officers responded to a shooting outside a residence on 12th Street in Weslaco. Officer Aaron Martinez was one of the first officers to arrive on scene. Martinez testified that he noticed a white Mercury with several bullet holes on the driver's side door parked outside what was later identified as Herrera's residence. As he got closer, he noticed an unresponsive adult male slumped over in the driver's seat. The body was later identified as Guadalupe Salinas Jr., and his final cause of death was identified as a perforated gunshot wound to the chest.

Sarely Martinez and Sonia Alfaro witnessed the shooting. Sarely testified that she was dropping off Sonia, her long-time friend and coworker, after work that day. Sarely parked in front of Sonia's house and they talked for a few minutes. As they talked, Sarely noticed a tall, skinny man standing outside Herrera's residence. Sonia recognized the man as Herrera because she had lived next to him and his family for about twenty years.

Within a few minutes, a white car parked in front of Herrera's residence facing the front of Sarely's vehicle. A man, later identified as Salinas, exited the vehicle and started speaking with Herrera. Sarely and Sonia heard "firecrackers" within seconds of Salinas

2

getting out of his vehicle and saw Salinas back up against his car, turn to shield himself, then get back into the driver's seat. Sonia testified that she saw Herrera shooting Salinas from the front of his house. Sarely testified that she watched Salinas the whole time. She said that, to her, he did not look "like a threat" or look like "he was expecting to get shot" when he exited his vehicle. She also testified that "he looked scared" as he was getting shot. After Salinas got back into the car, Sarely reversed her vehicle and pulled into the driveway of a neighbor's house to call for help.

Alfredo Alfaro, Sonia's husband, also testified. He said he was waiting for his wife to come home that day when he heard what sounded like firecrackers nearby. He walked outside to see his wife and Sarely banging on the neighbor's door. He called the police, who arrived about three or four minutes later. Alfredo testified that his home had a security system which he installed because he was worried about "drug deals" at Herrera's residence. He believed Herrera sold drugs because he could smell "recreational drugs" occasionally and he saw cars coming to Herrera's house at all hours of the day. Footage from the day of the shooting recorded by the Alfaros' security system was admitted into evidence and presented to the jury. The camera footage did not depict the shooting but showed Herrera pacing up and down the street minutes prior to Salinas's arrival, Sarely's vehicle parked in front of the Alfaros' residence, and a white car parked in front of Herrera's residence, with just the front bumper visible in the footage.

Lieutenant Alvino Flores collected and documented evidence from the crime scene. He testified that bullet casings were found on Herrera's driveway, and bullet casings and fragments were found in and around Salinas's vehicle. Evidence also showed that bullets had pierced the house, trees, and a trash can across the street from

3

Herrera's residence. Lieutenant Flores testified that he spent hours searching for weapons in Salinas's vehicle but could not find any. However, he stated that a black and brown pocketknife was found near Salinas's vehicle.

A search for Herrera took place for three or four hours before Herrera returned home and barricaded himself in his room. Officers on scene made several commands for Herrera to come out of his room. Because Herrera apparently refused to exit the room, the officers began pushing and breaking the door down. Lieutenant Flores breached the room from the outside by breaking through an air conditioning unit in the window. Officer Eric Pemelton[1] tased Herrera through the opening they made in the door. There was conflicting testimony about whether Herrera pointed a gun at the officers, though it was undisputed that upon arrest Herrera did not have a gun or any other weapon on him.

Lieutenant Flores and other officers collected bullets, a nine-millimeter handgun, a .22 caliber revolver, and baggies of a white, powdery substance as well as a green, leafy substance from Herrera's room. Erica Saldivar, a forensic scientist at the Texas Department of Public Safety (DPS) Crime Laboratory, analyzed the substances from the crime scene. She confirmed that the white powdery substance was cocaine, and the green, leafy substance was marijuana. Saldivar weighed the substances and testified that the cocaine weighed 15.05 ounces and the marijuana weighed 1.75 pounds. Norma Luna, a forensic scientist with the Texas DPS, testified as the State's firearms expert. Luna made comparisons between the nine-millimeter handgun found in Herrera's room and the

---

[1] Officer Eric Pemelton's name also appears as Pembleton in the record.

4

bullets and bullet casings found on the scene. Luna testified that the tests she ran confirmed that the bullets came from Herrera's gun.

Herrera's cell phone was also confiscated after his arrest. FBI Special Agent Matthew Allison, a digital forensic examiner, was called as a witness to authenticate data recovered from Herrera's phone. The records were admitted; however, the defense objected to the entirety of the cell phone's contents being viewable to the jury. The court sustained the defense's objection and limited the State to displaying images relevant to the case, including images of guns or controlled substances. The State proceed to show two images authenticated by Allison to the jury.[2] Agent Allison also extracted the text messages between Herrera and Salinas from Herrera's phone and compiled them into a spreadsheet, which was admitted as a separate exhibit and without objection.

After Herrera was transported to the police station and given his *Miranda* warnings, Sergeant Felix Salinas, the lead investigator on the case, conducted Herrera's two post-arrest interviews. Sergeant Felix testified that Herrera admitted that he often sold drugs to Salinas, and that he shot him that day out of self-defense. According to Herrera, he and Salinas had gotten into an argument through text messages, and they had agreed to meet up at noon to fight. Sergeant Felix said that Herrera admitted to shooting Salinas seven or eight times, however, Herrera contended that Salinas shot at him as well. Sergeant Felix testified that in his opinion, Herrera's assertion was unfounded because Salinas did not have a gun on him and no bullet holes were found on the outside of Herrera's house. Sergeant Felix also stated that he saw Herrera "holding something,"

_____

[2] The transcript shows the State stated the same file name twice when showing the images to the jury, but the record does not indicate what the images depicted. Upon review of the cell phone records, we observe that the image appears to be a picture of marijuana.

5

potentially a gun, in the Alfaros' security footage. Finally, Sergeant Felix said he did not believe Herrera's claim of self-defense based on the cumulation of evidence, including the witness interviews, the Alfaros' security footage, "the trajectory of the rounds, the casings found in the area, [Herrera] fleeing the scene, [and] the amount of shots fired."

The jury convicted and sentenced Herrera as outlined above. This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

### A. Standard of Review & Applicable Law

In reviewing the sufficiency of the evidence to support a conviction, "we consider the evidence in the light most favorable to the verdict" and determine whether, based on the evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Edward v. State*, 635 S.W.3d 649, 655 (Tex. Crim. App. 2021) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The jury is the exclusive judge of the credibility of the witnesses and the weight to be given to the evidence. *See Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). We defer to the jury's responsibility to fairly resolve conflicts in testimony, weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* This standard applies to both circumstantial and direct evidence. *Id.* We do not engage in a second evaluation of the weight and credibility of the evidence, but only ensure the jury reached a rational decision. *Muniz v. State*, 851 S.W.2d 238, 246 (Tex. Crim. App. 1993).

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009). Here, a hypothetically correct jury charge would instruct the jury that Herrera was justified in using deadly force against Salinas "when and to the degree he

6

reasonably believed the force was immediately necessary to protect himself" against Salinas's use or attempted use of unlawful deadly force. *See* TEX. PENAL CODE ANN. §§ 9.31(a), 9.32(a). A "reasonable belief" is defined as one that would be held by "an ordinary and prudent [person] in the same circumstances as the actor." *Id.* § 1.07(a)(42).

A defendant has the burden of producing some evidence to support a claim of self-defense. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). Once the defendant produces that evidence, the State then bears the burden of persuasion to disprove the raised defense. *Id.* The burden of persuasion does not require the State to produce evidence; it requires only that the State prove its case beyond a reasonable doubt. *Id.* A determination of guilt by the factfinder implies a finding against the defensive theory. *Id.* The issue of self-defense is a fact issue to be determined by the jury, which is free to accept or reject the defensive issue. *Saxton v. State*, 804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991). As the sole judge of the weight and credibility accorded any witness's testimony, the jury is free to believe or disbelieve the testimony of all witnesses, and to accept or reject any or all of the evidence produced by the respective parties. *See Upton v. State*, 853 S.W.2d 548, 552 (Tex. Crim. App. 1993).

## B.    Analysis

Herrera argues that the State did not meet its burden to disprove Herrera's self-defense claim beyond a reasonable doubt because "the State focused primarily on proving Herrera provoked Salinas" and "ignored disproving Herrera's defensive theory."[3]

---

[3] The State did not file a brief in this appeal.

7

Herrera did not testify; instead, he presented his self-defense theory through cross-examination of witnesses regarding the text messages exchanged between him and Salinas. The argument between Herrera and Salinas seemingly began on the evening of June 7, 2020, when Herrera advised Salinas that he could not supply him with drugs. Subsequently, Salinas and Herrera exchanged numerous insults and threats in dozens of text messages throughout the night and morning of the next day, leading up to the shooting.

During cross-examination, Herrera's defense counsel noted that one of the texts sent by Salinas referenced his .40-caliber handgun, and the fact that Salinas was thirty-six years old and Herrera was only twenty-three years old at the time. The defense also elicited testimony from Sergeant Felix that Salinas had a prior assault conviction, and that a toxicology report indicated that Salinas was intoxicated on cocaine and alcohol when he arrived at Herrera's residence. The defense argued that it was reasonable for Herrera to use self-defense to defend against Salinas's impending attack because of Salinas's text messages, his age, his prior assault, his alleged gun, and his intoxication.

However, other evidence at trial undermined Herrera's defensive claims. Evidence showed that Herrera fired at least seven or eight times in broad daylight and Salinas sustained three gunshot wounds. Though Herrera told police that Salinas had shot at him, no firearm was found on Salinas's person or in his vehicle, and no bullet holes were found on the outside of Herrera's house. Other evidence showed that Salinas told Herrera when he was coming and Herrera was expecting his arrival, including video evidence showing Herrera pacing up and down the street in front of his house minutes before the encounter. The text messages themselves indicated that Herrera actively provoked Salinas to fight

8

him in person. *See* TEX. PENAL CODE § 9.32(b)(2); *Smith v. State*, 965 S.W.2d 509, 512 ("The rule of law is that if the defendant provoked another to make an attack on him, so that the defendant would have a pretext for killing the other under the guise of self-defense, the defendant forfeits his right of self-defense"). Herrera also fled the scene for hours before he was captured. *See Bigby v. State*, 892 S.W.2d 864, 883 (Tex. Crim. App. 1994) (holding that evidence of flight or escape can support an inference of guilt).

Here, the jury chose not to believe the evidence supporting Herrera's claim that he acted in self-defense when he shot Salinas. The jury weighed the credibility of the testifying officers, who dispelled Herrera's contention that Salinas shot at him, and the eyewitnesses to the shooting, who testified that Herrera kept shooting Salinas even as Salinas appeared to retreat. The text message exchange between Herrera and Salinas, as well as Herrera's statements to police, in light of the other evidence presented at trial, do not render the evidence insufficient to support the jury's verdict. *See Chambers*, 805 S.W.2d at 461; *Smith*, 355 S.W.3d at 146 (holding jury could have reasonably rejected appellant's defensive theory based on the State's witnesses, the physical evidence, and the fact that appellant fled after the victim's death); *see also Cleveland v. State*, 177 S.W.3d 374, 380–81 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (holding jury could have reasonably rejected appellant's defensive theory because "appellant stabbed his wife after disarming her, while she was unarmed and seated on a sofa"). We overrule Herrera's first issue.

### III. LOST OR DESTROYED EVIDENCE

#### A. Standard of Review & Applicable Law

An appellant is entitled to a new trial if—through no fault of the appellant—a reporter's record is lost or destroyed, and the lost or destroyed portion is necessary to the resolution of the appeal and cannot be replaced by agreement of the parties or "with a copy determined by the trial court to accurately duplicate with reasonable certainty the original exhibit." TEX. R. APP. P. 34.6(f). If the missing portion of the reporter's record is not necessary to the resolution of the appeal, the appellant is not entitled to a new trial. *See id.*; *Nava v. State*, 415 S.W.3d 289, 306 (Tex. Crim. App. 2013). The provision in appellate rule 34.6 requiring an appellant to show that the missing portion of the record is necessary to the appeal is essentially a requirement that the appellate court perform a harm analysis. *Nava*, 415 S.W.3d at 306; *Routier v. State*, 112 S.W.3d 554, 571–72 (Tex. Crim. App. 2003). We review a trial court's findings under Rule 34.6(f) for an abuse of discretion. *See Johnson v. State*, 524 S.W.3d 338, 340 (Tex. App.—Corpus Christi–Edinburg 2017, no pet.).

#### B. Analysis

The court reporter notified this Court on January 31, 2023, that State's Exhibits 100 and 106 were either missing, lost, or destroyed.[4] Exhibit 100 contained the cell phone records extracted from Herrera's phone, and Exhibit 106 contained digital recordings of Herrera's two interrogations with law enforcement. Thereafter, we abated this appeal and

---

[4] The court reporter also notified this Court that State's Exhibit 7 was missing, lost, or destroyed. Exhibit 7 contained footage from some of the responding officers' dashboard cameras. Herrera concedes that State's Exhibit 7 is not necessary to resolve the issue in this appeal and as such we do not address it in our analysis.

remanded to the trial court to conduct a hearing and determine whether the aforementioned exhibits were missing, lost, or destroyed, and to make findings under Texas Rule of Appellate Procedure 34.6(f), if necessary. *See* TEX. R. APP. P. 34.6(f). After holding two hearings on the order of abatement, the trial court found that (1) "[E]xhibit 100 only needed additional software to be made viewable and as such [wa]s not missing, lost or destroyed"; and (2) Exhibit 106 was missing or destroyed, but the copy of Exhibit 106 provided by the State was a duplicate "within the Court's independent determination as the parties did not agree they were duplicates." *See id.*

On appeal, Herrera argues that "there is no way of knowing" whether Exhibit 100 and the duplicate of Exhibit 106 are "authentic and accurately mirror the exhibits presented to the jury during Herrera's trial" because the trial court did not independently examine the exhibits at the hearing and the defense was not permitted to inspect the exhibits. We construe Herrera's argument to mean that the trial court abused its discretion when it accepted the State's reproduced exhibits as accurate duplicates. *See id.* R. 34.6(f)(4). Herrera further argues that Exhibits 100 and 106 are necessary to the issue in this appeal. *See id.* R. 34.6(f)(3).

The trial court conducted hearings on the order of abatement on March 29, 2023, and April 12, 2023. The court reporter testified at the March hearing that Exhibit 100 was encrypted and Exhibit 106 could not be opened because something was wrong with the file. The parties then agreed to give the State time to reproduce the exhibits. At the second hearing in April, the State offered a reproduction of Exhibit 106 and told the trial court that

11

Exhibit 100 could be opened with "Cellebrite,"[5] which it would provide to the court of appeals to view the exhibit.[6] Herrera's appellate counsel urged the trial court to grant him thirty days to review the duplicate materials provided by the State. The trial court granted the defense's request for a thirty-day continuance and the trial court then asked for an extension from this Court on April 14, 2023. On May 17, 2023, a supplemental record was filed containing the trial court's findings, and we reinstated the appeal on June 7, 2023.

While the record does not explicitly illustrate whether the trial court viewed the exhibits at the hearing, Herrera omits the fact that the trial court granted his request for a thirty-day continuance to review the exhibits. He does not explain in his brief if he was ever able to view and inspect the exhibits. However, even if the trial court abused its discretion by accepting the duplicates and preventing Herrera from viewing the exhibits at the hearing, Herrera fails to explain how the exhibits are necessary to this appeal. *See id.* R. 34.6(f)(3)*.* He baldly asserts that Exhibits 100 and 106 are necessary without citing to authority and without describing how they are relevant to the sufficiency of evidence argument above. He also fails to explain how these exhibits are necessary when duplicative evidence was admitted at trial without objection. *See In re S.V.*, 599 S.W.3d 25, 34 (Tex. App.—Dallas 2017, pet. denied) (determining missing portion of record was sufficiently described by witnesses and thus not necessary to the issues on appeal); *Landry's Seafood House-Addison, Inc. v. Snadon*, 233 S.W.3d 430, 437 (Tex. App.—

---

[5] "Cellebrite" is a computer application used to extract and read forensic data from digital devices. *See Wright v. State*, 618 S.W.3d 887, 890 (Tex. App.—Fort Worth 2021, no pet.).

[6] After the hearings, the State submitted a version of Exhibit 100 to this Court, but the exhibit was blank. We subsequently ordered the clerk of the trial court and the court reporter to forward the actual exhibit within ten days. The exhibit was submitted a month after the order and viewable only through the Cellebrite application.

Dallas 2007, pet. denied) (holding the missing trial testimony was not necessary to the appeal because it "did not concern either the proper party or the damages issues" argued by appellant). For example, during trial, Herrera did not dispute the authenticity or admissibility of State's Exhibit 101—a spreadsheet detailing the text messages between Herrera and Salinas. Herrera also never disputed Sergeant Felix's testimony describing Herrera's answers in the interrogation interviews, which is the same material found in Exhibit 106.[7]

Because Herrera has failed to establish that the exhibits are necessary to this appeal, we overrule Herrera's second issue.

## IV.   CONCLUSION

We affirm the trial court's judgment.

DORI CONTRERAS
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
25th day of April, 2024.

---

[7] Herrera objected to playing the interrogation interviews to the jury on the basis that Sergeant Salinas was "mak[ing] assertions instead of asking questions," and that his assertions in the interrogation were "hearsay." However, Herrera has not renewed this objection on appeal.

13